1

2

3

4

5

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
         lsironski@bursor.com

6

*Attorneys for Plaintiffs*

7

8

## UNITED STATES DISTRICT COURT

9

## NORTHERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

| | |
|---|---|
| C.M. and M.C., on behalf of themselves and all others similarly situated,<br><br>                          Plaintiffs,<br>      v.<br><br>MARTIAN SALES, INC. (d/b/a CHOICE ORGANICS); PEYTON SHEA PALAIO (a/k/a PAYTON PALAIO or PEYTON PALAIA); JOPEN LLC (d/b/a A1 WHOLESALE, PARTY NUTS, EVOLUTIONARY ORGANICS, INNOVO ACTIVAS, AMERICAN KRATOM-D); LGI HOLDINGS, LLC (d/b/a ALPHABET WHOLESALE); LP IND., LLC (d/b/a OLISTICA LIFE SCIENCES GROUP, CENTRALIZED SERVICES, JORDAN PROCESS, CASCADE NATURALS, DELLA TERRA PHARMACEUTICALS, NATUREA BIOMATERIALS [a/k/a CANNOPY CORPORATION]); CAG HOLDINGS CO, LLC (d/b/a COMPANION AG); CALIBRE MANUFACTURING, LLC (f/k/a ADVANCED NUTRITION, LLC); NUZA, LLC (a/k/a NUZA LOGISTICS, f/k/a ADVANCED NUTRITION, LLC); JOHN DOE CORPORATIONS 1-10; and OTHER JOHN DOE ENTITIES 1-10,<br><br>                         Defendants. | Case No. 3:23-cv-06202-AMO<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

28

1   Plaintiffs C.M. and M.C. ("Plaintiffs") bring this action on behalf of themselves and all
2   others similarly situated against Defendants Martian Sales, Inc., (d/b/a O.P.M.S, Choice Organics);
3   Peyton Shea Palaio (a/k/a Payton Palaio or Peyton Palaia); Jopen LLC (d/b/a A1 Wholesale, Party
4   Nuts, Evolutionary Organics, Innovo Activas, American Kratom-D); LGI Holdings, LLC (d/b/a
5   Alphabet Wholesale); LP Ind., LLC (d/b/a Olistica Life Sciences Group, Centralized Services,
6   Jordan Process, Cascade Naturals, Della Terra Pharmaceuticals, Naturea Biomaterials [a/k/a
7   Cannopy Corporation]); CAG Holdings, LLC (d/b/a Companion Ag); Calibre Manufacturing, LLC
8   (f/k/a Advanced Nutrition, LLC); Nuza, LLC (a/k/a Nuza Logistics, f/k/a Advanced Nutrition,
9   LLC); John Doe Corporations 1-10; and Other John Doe Entities 1-10 (collectively, "Defendants").
10  Plaintiffs make the following allegations pursuant to the investigation of their counsel and based
11  upon information and belief, except as to the allegations specifically pertaining to themselves,
12  which are based on personal knowledge.

13  ## NATURE OF THE ACTION

14  1.   This is a civil class action lawsuit against Defendants for their false, misleading,
15  deceptive, and negligent sales practices regarding their OPMS-brand kratom powder, capsule, and
16  liquid extract products (the "Products").  Kratom is a dried leaf that is sold as a loose powder,
17  packaged into gel caps, or made into an extract.  However, what reasonable consumers do not
18  know, and Defendants fail to disclose, is that the "active ingredients" in kratom are similar to
19  opioids.  That is, kratom works on the exact same opioid receptors in the human brain as morphine
20  and its analogs, has similar effects as such and, critically, has the same risk of physical addiction
21  and dependency, with similar withdrawal symptoms.  When reasonable consumers think of opiates
22  and opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, and morphine; they do not
23  expect that the "all natural" product bought at their local corner store operates like an opioid, with
24  similar addiction and dependency risks.  Kratom is perniciously addictive – on a whole different
25  level than caffeine or nicotine – and it has sunk its hooks into tens of thousands of unsuspecting
26  consumers and caused them serious physical, psychological, and financial harm.  Here, Defendants
27  intentionally and negligently failed to disclose these material facts anywhere on the Products'

labeling, packaging, or marketing materials, and have therefore violated warranty law and state consumer protection laws in the process.

2.      Extensive investigative reporting by the Tampa Bay Times, and upon the research of counsel, has revealed that Defendants are all part of a singular enterprise responsible for various aspects of growing, importing, designing, manufacturing, testing, processing, labeling, packaging, shipping, marketing, and selling their kratom Products under the "OPMS" brand name across the United States (the "OPMS Kratom Enterprise.").[1]  The OPMS Kratom Enterprise is spearheaded by Defendant Peyton Palaio and Mark Reilly, President of Martian Sales, Inc., who have employed a web of shell companies, alter egos, business names, assumed names, and trade names to obfuscate the immense scope of their operation and dodge liability for their actions under the OPMS brand.  Defendants operate collectively: each of them is within the chain of distribution of OPMS products, operates as OPMS, controls, or owns OPMS, and/or is an affiliate of OPMS. Defendants share principals, membership, agents, and addresses.  Thus, Defendants should be considered as part of a collective whole, sister entities operating in furtherance of the OPMS Kratom Enterprise at the behest of Peyton Palaio, Mark Reilly, and other key unknown individuals.

3.      Defendants rely on their Products' innocuous packaging and the public's limited knowledge about kratom and its pharmacology to get users addicted, while reaping profits along the way.  Reasonable consumers do not expect the liquid extract bottles and pouches of kratom powder or capsules, which they can purchase at gas stations and corner stores, to perform like an opioid with the same addictive potential of morphine and its analogs.  Defendants rely on this ignorance and do nothing to correct it.  Such activity is outrageous and is in contravention of California law and public policy.

4.      Defendants' chief officers, Peyton Palaio and Mark Reilly, have a history of prioritizing profits over public health.  They are no strangers to the civil *and* criminal legal

---

[1] *See* Hannah Critchfield, Helen Freund and Langston Taylor, *DEADLYDOSE PART 3: Kratom's path across the US is marked by deception and secrets*, TAMPA BAY TIMES (December 17, 2023 htt2s:// project. tampabay. com/ investigations/ deadly- dose/ kratom- industry- opms-supply-chain-indonesia-florida); Hannah Critchfield, *A major US kratom brand relies on a maze of companies. Here′ s the list,* TAMPA BAY TIMES ( Dec. 19, 2023) (https://www.tampabay.com/investigations/2023/12/19/major-us-kratom-brand-relies-maze-companies-heres-list/ ).  The reporting is attached hereto as **Exhibit A** and **Exhibit B**.

1    systems.  The products sold as part of the OPMS Kratom Enterprise, and their previous synthetic

2    cannabis enterprise, have killed multiple people, resulting in wrongful death lawsuits and millions

3    of dollars in settlement payments.

4       5.  Defendants and their officers have used the Kratom Enterprise to peddle an

5    addictive substance to unsuspecting and oftentimes vulnerable consumers.  Plaintiffs seek relief in

6    this action individually, and as a class action on behalf of similarly situated purchasers of

7    Defendants' Products, for: (i) violation of California's Unfair Competition Law ("UCL"), Cal. Bus.

8    & Prof. Code §§ 17200, *et seq.*; (ii) violation of California's Consumers Legal Remedies Act

9    ("CLRA"), Cal. Civil Code §§ 1750, *et seq.*; (iii) violation of California's False Advertising Law

10   ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (iv) breach of implied warranty; (v) unjust

11   enrichment; (vi) fraud by omission; and (vii) negligent misrepresentation.

12      6.  Because this action concerns issues of addiction and medical status, Plaintiffs are

13   filing under their initials for the sake of their personal privacy.  Plaintiffs are reasonable consumers

14   who fell victim to Defendants' omissions and misrepresentations about the addictive nature of

15   kratom, which operates like an opioid, and became addicted as a result.  Since addiction issues are

16   still wrongly stigmatized, Plaintiffs are filing this matter anonymously but will reveal their names

17   as necessary to the Court under seal.

18                **PARTIES**

19      7.  Defendant Martian Sales, Inc., is a Wyoming corporation with its principal place of

20   business in Sheridan, Wyoming.  Mark D. Reilly, a longtime associate of Peyton Palaio, is the

21   President of Martian Sales, Inc., which owns the trademark for OPMS.  The Martian Sales' 2021

22   and 2022 Annual Reports list 2550 Sandy Plains Road, Suite 225 Box 319, Marietta, Georgia

23   30066 as its principal business location.  The OPMS trademark was registered in an office suite

24   that has been long associated with Palaio and Reilly – 1880 West Oak Parkway, Suite 214,

25   Marietta, GA 30062.[2]

26

27

28   [2] **Exhibit C**, OPMS Trademark Filing Address.

8.      Defendant Peyton Palaio (also known as Peyton Palaia, Payton Palaia, and Payton Palaio) is a citizen and resident of the State of Georgia.  Peyton is the head of the Kratom Enterprise and was the original creator of the OPMS brand in Marietta, Georgia in or around 2012.  Though he may not appear on any official business filings, interviews with employees and kratom distributors "mention Palaio by name as the CEO or head of the [OPMS Kratom Enterprise]."[3]

9.      LGI Holdings, LLC (d/b/a Alphabet Wholesale) ("LGI") is a Wyoming limited liability company located at 30 N Gould St. Ste. 22533, Sheridan, WY 82801 USA.  The 2021 Annual Report lists 2550 Sandy Plains Road, Ste. 225 Box 319, Marietta, GA 30066 as its principal office address.  The 2024 Annual Report lists Conner W. Watts, 245 Peachtree Center Ave., NE, Atlanta, GA 30303 as the organizer of Defendant LGI Holdings, LLC.[4]  However, Peyton Palaio has claimed in signed court filings that he is the true head of LGI Holdings.  Documents filed in a lawsuit against Palaio and LGI show that Peyton Palaio used LGI to enter into a kratom supply deal with Cleanview Distribution Group, a company located in Los Angeles, California.  LGI appears to handle kratom imports for the Kratom Enterprise, with internal documents showing that it intended to import around **35 million kilograms of kratom** over a six-year period through the ports of Oakland and Los Angeles.  The kratom was ultimately intended for use in the manufacture of OPMS capsules and extracts in Georgia, Colorado, and Texas.  Palaio placed orders for raw kratom through LGI to obfuscate that the OPMS Kratom Enterprise was behind it.

10.     LP Ind., LLC (d/b/a Olistica Life Sciences Group, Centralized Services, Jordan Process, Cascade Naturals, Della Terra Pharmaceuticals, Naturea Biomaterials [a/k/a Cannopy

---

[3] **Ex. A** at 10.

[4] Conner Watts is an Atlanta-based attorney who appears all over the OPMS Kratom Enterprise's legal filings.  He appears to handle legal filings for real property holding companies for the OPMS Kratom Enterprise.  Each parcel of land or building is assigned its own LLC as a means of hiding the extent of the kratom operation.  For instance, Conner Watts is listed as the organizer for "Highway 160 Way, LLC" which holds title to the land in Springfield, Colorado where Defendant Jordan Process operates a kratom extract lab.  Conner is also the organizer of  "1199 Industrial LLC," which owns a building located at 1199 Atlanta Industrial Drive, Marietta GA, which is where Defendant Calibre Manufacturing processes and encapsulates OPMS kratom.  *See https://opencorporates.com/officers?utf8=%E2%9C%93&utf8=%E2%9C%93&q=Conner+Watts &jurisdiction_code=&type=officers.*

Corporation]) ("Olistica" or "Jordan Process") is a Wyoming limited liability company located at 30 N Gould St., STE 20464, Sheridan, WY.   Its 2021, 2022, and 2023 Annual Reports listed 2550 Sandy Plains Road, Ste. 225, Box 319, Marietta, GA  30066 as its principal place of business. Until early 2023, Peyton Palaio openly held himself out as the CEO of Olistica.[5]  This allegation is substantiated by emails from Peyton which were filed as exhibits in another lawsuit,[6] in which Peyton refers to Olistica as his "operation"[7] which is part of a network of corporations forming the "largest kratom business in the United States."[8]  That email from Peyton also included an attachment, a business presentation for Olistica which details that Olistica and the other LP Ind., LLC entities are in charge of kratom farming, kratom research, and OPMS extract production. OPMS extract production is handled specifically by Jordan Process at a facility at 23298 US Highway 160, Springfield, Colorado.[9]  Jordan Process is named after Palaio's brother, Samuel Jordan Palaio, who died of a heroin overdose in 2015.[10]

11.     Jopen, LLC (d/b/a A1 Wholesale, Evolutionary Organics, Innovo Activas, American Kratom-D, and Party Nuts), is a limited liability company formed in Texas and Wyoming.  Jopen operates in all parts of the OPMS Kratom Enterprise.  Jopen places orders for kratom and pays invoices for orders made by other OPMS Defendant entities.  It acts as a manufacturer of OPMS kratom through its operations in Georgia as Innovo Activas and American Kratom-D (which operate or operated in the same office suite in Marietta, Georgia where the trademark for OPMS was registered).  It sells OPMS kratom wholesale through PartyNuts.com (which shares a warehouse with A1 Wholesale).  And it packages, labels, and distributes OPMS kratom through A1 Wholesale at another warehouse located at 4949 Beeman Avenue, Dallas, Texas.  Thus, Jopen and its fictitious entities take part in the OPMS Kratom Enterprise throughout

[5] *See,* **Exs. A** and **B.**

[6] **Ex. D,** *Cleanview Distribution Group, LLC, v. LGI Holdings LLC, Peyton Palaio, et al.,* No. 2:21-cv-07178-SB-JC, Complaint.

[7] **Ex. E,** Olistica Slide Deck.

[8] **Ex. D,** Cleanview Complaint ¶ 2.

[9] **Ex. E.**

[10] **Exhibit A** at 23.

the United States, including in California where most raw kratom enters the country, and from where it orders raw kratom shipments.  In secretary of state filings, Jopen declares it operates A1 Wholesale, Party Nuts, and Evolutionary Organics out of the same address: 203 N Prairie Ave, Dallas, TX 75246.[11]

12.     CAG Holdings CO, LLC (d/b/a Companion AG) is a Colorado foreign entity with its principal place of business at 23298 US Highway 160, Springfield, CO 81073.  It operates under the Olistica Life Sciences Group umbrella of Defendant entities.  Internal documents filed as exhibits in the *Cleanview* lawsuit indicate that Companion AG is in charge of cultivating relationships with kratom farmers in South Asia.[12]  It describes itself as "a modern co-op that manages select commercial agricultural crops" that focuses "on medicinal plants, botanicals, and biomaterial feedstock alternatives or sustainable materials feedstocks."  It deals with farmers which "range in size from one-acre farms to those with more than 10,000 acres in agricultural production."[13]

13.     Calibre Manufacturing, LLC is a Wyoming limited liability company.  Its Articles of Organization in 2021 lists 2550 Sandy Plains Road, Ste. 225, Box 319, Marietta, GA 30066 as its principal place of business.  Calibre operates at 1199 Atlanta Industrial Drive, Marietta, GA, and 9305 Industrial Trace, Alpharetta, GA 30004, where it processes and encapsulates OPMS kratom.  Calibre Manufacturing used to be known as Advanced Nutrition LLC.[14]  Advanced Nutrition LLC used to list 1880 West Oak Parkway, Suite 214, Marietta, GA as its principal place of business, where the OPMS trademark was registered and where Peyton Palaio and Mark Reilly ran one of their prior ventures, a synthetic cannabis operation.  In late 2022 Advanced Nutrition split off into two Defendant entities, Calibre Manufacturing, LLC and Nuza LLC.[15]

14.     Nuza, LLC (d/b/a Nuza Logistics) is a Wyoming corporation with its principal place

---

[11] **Ex. F**, Jopen LLC Secretary of State Filing.

[12] **Ex. E**, Olistica Slide Deck.

[13] *Id.*

[14] **Ex. B**

[15] *Id.*

of business at 30 N Gould St. Ste. 32632 Sheridan, WY 82801.  Nuza is also registered in Georgia where it conducts its operations in Marietta.  Online job postings indicate that Nuza is in charge of shipping OPMS from and to the various production facilities run by Defendants around Marietta and Alpharetta, Georgia.  Nuza LLC, along with Defendant Calibre Manufacturing LLC, used to be known as Advanced Nutrition LLC.

15.     Defendants John Doe Corporations 1 through 10 are corporations, the names and addresses of residences of which are presently unknown.

16.     Defendants John Doe Entities 1 through 10 are other persons or legal entities, the names and addresses of residences of which are presently unknown.

17.     Defendants should be treated as a single enterprise for purposes of this litigation because they have:

(a)     Commingled their funds and other assets and failed to segregate funds between them;

(b)     Treated each other's assets as their own;

(c)     Failed to maintain minutes and corporate records and confused the records of the other OPMS Defendant entities;

(d)     Used the same business locations and employed the same employees;

(e)     Share a unity of interest and ownership that each of the Defendants acts merely as a shell of the OPMS Kratom Enterprise as a whole; and

(f)     Failed to adequately capitalize themselves such that if only one entity were to be held liable for the actions of the whole it would be unable to compensate Plaintiffs and the putative class for their harms and thereby promote injustice, unfairness, and fraud.

18.     Plaintiff C.M. is a citizen of California who resides in Burlingame, California and intends to stay there.

19.     Plaintiff M.C. is a citizen of California who resides in Napa, California and intends to stay there.

20.     Plaintiffs reserve the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of

Defendants who has knowingly and willfully aided, abetted, and/or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.

22. This Court has personal jurisdiction over the parties because Plaintiffs reside in California, are citizens of California, and submit to the jurisdiction of the Court, and because Defendants have, at all times relevant hereto, systematically and continually conducted, and continue to conduct, business in this State. Defendants therefore have sufficient minimum contacts with this State, including within this District, and/or intentionally availed themselves of the benefits and privileges of the California consumer market, and directed their activities thereto, through their business activities in furtherance of the OPMS Kratom Enterprise within the State, and through the sale of OPMS kratom to distributors and wholesalers within this District and throughout this State.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants regularly do business in this District by directing the sale of their OPMS kratom Products to wholesalers and distributors in this District, and by using a port located in this District to import kratom. Further, the same misrepresentations, omissions, and injures giving rise to the claims alleged herein have occurred in this District (e.g., the distribution and sale of OPMS kratom to Plaintiffs, and Plaintiffs' subsequent addiction to kratom).

## FACTUAL ALLEGATIONS

### A.     Background and Pharmacology of Kratom

24. Kratom is a drug[16] which is derived from the kratom plant, *mitragyna speciosa*, indigenous to Southeast Asia, where it has been used in herbal medicine since at least the early

---

[16] Kratom is unregulated by the FDA, so the usage of the word "drug" here is meant in the colloquial sense, rather than as a defined term under the Food, Drug, and Cosmetic Act.

19th Century.  Use of the plant has been particularly well-documented in Thailand, Indonesia, and Malaysia, and it remains popular in each of those countries to this day.  Kratom is the most widely used drug in Thailand, for example.

25.     The first reported use of Kratom in the scientific literature dates back to 1836 when it was noted that the leaves of the tree were used by Malays as a substitute for opium.

26.     The plant's leaves are harvested, dried, and crushed into a fine powder which is then packaged, either straight into a pouch or in capsules, and sold by manufacturers like Defendants. The drug can also be extracted into a liquid formulation, colloquially called a kratom "shot."

27.     Kratom extracts like those which comprise the majority of Defendants' Product offering are significantly more addictive than raw kratom because of its unique chemical composition.

28.     In the West, Kratom is sold through the Internet and at herbal stores, gas stations, corner stores, smoke shops, and "head" shops where it is primarily marketed as an herbal medicine or supplement to treat a variety of ailments (*e.g.*, pain, mental health, opioid withdrawal symptoms), as well as a "legal" or "natural" high by some manufacturers.

29.     The chemicals in the plant which produce a psychoactive effect when ingested are called "alkaloids."

30.     The primary alkaloids in kratom plant leaves responsible for the kratom "high" are Mitragynine[17] ("MG") and 7-hydroxymitragynine ("7-MG").

31.     MG and 7-MG exhibit a wide variety of pharmacological effects, resulting in a highly dose-dependent response.  For example, a low dose (0.5 grams to 3 grams) of kratom is typically described as stimulating or energizing, whereas a high dose (3+ grams) is described as euphoric, sedating, and analgesic.  On the whole, however, kratom's high is not overwhelming like it would be for a "hard" drug like cocaine or heroin – it is somewhat more subtle but its effects are nonetheless substantially similar to opiate-based painkillers such as hydrocodone and oxycodone in sufficient dosages.

---

[17] Pronounced "Mitra-Guy-Neen."

32.     Kratom's variable but not debilitating effects have always been part of its appeal. For instance, the use of kratom in Southeast Asia has been documented back for at least 150 years and the earliest accounts described both a stimulant effect for use in hard day-labor when fresh leaves are chewed, and an analgesic and relaxing effect if brewed into a tea.

33.     MG and 7-MG produce such a wide spectrum of effects because they interact with many different receptors in the brain.  Studies have shown that MG and 7-MG interact with alpha-2 adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors 5-HT2A and 5-HT2C, all of which contribute to the drug's mood-lifting and stimulant-like effects.

34.     Most crucially, MG and 7-MG also interact with the mu-opioid receptor.

35.     The mu-opioid receptor is known as "the gateway to addiction" because it is the receptor with which all opiates/opioids interact to produce the classic opiate high: euphoric, sedating, and analgesic.  This means that MG and 7-MG interact with the primary receptor that heroin and oxycodone interact with.

36.     There are other opioid receptors, but the mu-opioid receptor produces the most "hedonic" or habit-forming effects such as euphoria and analgesia.

37.     Mitragynine and 7-hydroxymitragynine have been found to be more potent to the mu-opioid receptor than morphine via oral administration.  7-MG in particular – which is found in substantially higher concentrations in kratom extracts compared to raw kratom – is about 10 times more potent than morphine, though the actual effect of kratom is dose-dependent, as discussed above.

38.     Kratom is therefore considered by health professionals to be similar to an "opioid" and a "quasi-opiate."

39.     The notion that kratom is substantially similar to an opioid, and a quasi-opiate, is reaffirmed by a few facts.  First, kratom's effects are very similar to those of other opioids. Second, when administered, kratom alleviates opioid withdrawal symptoms.  Third, repeated use of kratom in itself results in opioid withdrawal symptoms.

40.     All substances which act on the opioid receptors carry a very high risk of addiction, and kratom is no exception.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

41.     Addiction occurs when an opioid is ingested on a regular basis.  Over time, the user develops a tolerance to the drug, requiring increased dosages to get the same effects as a lower dose used to have.  As the dosages go up, the body becomes dependent on some amount of the drug to feel normal.  When the drug is suddenly taken away, the user feels much worse than before they started taking the drug: this is what is known as withdrawal.

42.     Opioids are addictive not just because of the pleasurable effects that they produce, but because sudden cessation of opioid use causes severe withdrawal symptoms which users feel compelled to avoid by taking more of the drug.  The tragedy of addiction is that users want to stop, but they cannot.

43.     The symptoms of kratom withdrawal are very similar to those of traditional opiate withdrawal.  Such symptoms include: irritability, anxiety, difficulty concentrating, depression, sleep disturbance including restless legs, tearing up, runny nose, muscle and bone pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, and extreme dysphoria and malaise.

44.     Users typically start substances like kratom because of how good it makes them feel, but, once addicted, they use them to avoid the pain of withdrawal.  It no longer is about getting high, but about not feeling "sick."

45.     With kratom in particular, users note that the addiction sneaks up on them, and that it feels as though, over time, the color has been sapped from their lives.  Long term users of kratom have reported experiencing depression, anxiety, anhedonia, and reduced sex drive.

**B.      Kratom Use and Addiction in the United States**

46.     Kratom use in the United States has exploded over the past decade.  As of 2021, the American Kratom Association estimates that kratom is a 1.3 billion dollar a year industry, with 11 million to 15 million annual users in the United States.

47.     Other studies have found that about 1 million people use kratom in the United States every month.  Two-thirds of those users use kratom daily.

48.     Kratom's popularity can be attributed to a number of factors: first, it is often marketed as a safe substitute for painkillers and appeals to those who equate "natural" with "safe;"

second, it has received attention from the media as a "nootropic" or "smart" drug because it is stimulating at low doses; third, its popularity has grown simply because it is so widely available, it produces a pleasurable high, and it is unregulated; finally, users are not aware that it is similar to an opioid with opioid addiction potential.

49.     On the whole, kratom is a relatively unknown drug to the average consumer.  Most people in the United States have never heard of it.

50.     The advertisements and commentary about kratom say that it is like a substitute for coffee, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, that it improves focus and gives users a boost of energy to get through the day.  These advertisements universally espouse the purported benefits that kratom use can provide, without disclosing that the drug is similar to an opioid with the addictive potential of one.

51.     What's more, because kratom does not produce a debilitating "high" like cocaine or heroin, it is very easy for users to take the drug every day without feeling as though they are developing a drug addiction or harming themselves.  This makes kratom a particularly insidious drug because addiction can sneak up on unsuspecting users and can hold them in its grip despite their best efforts to stop using.  The advertisements and word-of-mouth disclosures do not make this clear to consumers.

52.     Because manufacturers and advertisers of kratom, such as Defendants, do not disclose the addictive potential of kratom, many users have found themselves blindsided when they wake up one morning in the throes of withdrawal after having stopped using what they thought was an innocuous supplement.  They then discover just how painfully dependent they have become on kratom.  Because kratom is relatively unknown in the United States, many do not know where to turn for resources and aid.  Some users come together on the Internet to share their experiences and support each other as they attempt to get off the drug.  There are even well-populated and very active Internet forums serving as support groups for those struggling with and recovering from kratom addiction.

53.     The reports from users who have fallen into addiction, or succeeded in escaping the drug's grasp, are heart-wrenching.  Consistent amongst these reports is the initial shock that users

felt when they realized they had become unwittingly addicted, and just how difficult it was for

them to stop.  Below are just a few accounts from the "Quitting Kratom" forum on

www.reddit.com, which has over 45,000 members as of August 2024, and where the O.P.M.S.

brand is particularly reviled (dates listed below are with reference to the November 2023 date of

filing):

> About 8 months ago, one user wrote: "I've been on a 50gpd [grams per day] habit for about 4 years. Like most people here, **I was in denial that the Kratom was causing my multitude of issues. How could it be the Kratom when everyone keeps telling me how great it is?** I made myself believe that I had underlying issues that the Kratom was helping. Spoiler: It wasn't. **I slowly became a shell of the person I used to be. TRUE clinical depression symptoms with zero joy in my life.** I started browsing this subreddit and reading everyone's stories and I related to every single one. Everyone had the same exact experience I had and at that moment I knew it was the Kratom causing my depression." (emphasis added).

> About 2 years ago, a gas station employee wrote in a post titled "OPMS": "I work at a gas station where we sell kratom such as powders, gold and silver pills and especially shots (you know which one I'm talking about) **it's just mind blowing to me how many people are practically addicted and how many customers literally scavenge their money to pay for their daily shot**. Why are people so addicted especially to those shots."

> About 7 months ago, a user solicited "extract horror stories" in a post titled "Fuck OPMS Shots."  One user responded: "Took 2-3 shots a day for almost 2 years.  How did it screw me up?  Let me count the ways.  Financially it was draining me, 100%! **I would estimate 60% of my hair fell out.  My skin was grey.  My eyes were dark. I became a hermit.** No longer wanted to do anything, including self care or hygiene. Just taking a shower was a chore I had to talk myself into the last few months.  I was disgusting and did not care at all. All I cared about was that I had enough K for tomorrow."

> In response to the same "Fuck OPMS Shots" post, another user responded: "I used OPMS black pills and sometimes the shots for over 5 years.  I'm now 290 days clean from them. **They were so hard to kick bc of how addicting they are.**  And you can just walk in the store and buy them.  I was spending $45 day on this stuff.  **I wasted tens of thousands of dollars on it and my life suffered.**  Lots of my hair fell out and it's only now starting to grow back some, I think most of it is gone for good.  I'm repairing my marriage and friendships.  Everything.  Stay away from this stuff."

> Another user responded: "Amen.  This shit got hold of me as bad as anything else I've ever done... spent WAY more money on these fucking things than real honest to God hard drugs back in the day.  **Anywhere from 6-10 of these things daily for... years. Let's call it 7 at an average of $18/pop = $126/day x 30 = $3780/month = about $45k/year.** How fucking embarrassing.  I made $140,000 last year living in Georgia (pretty low cost of living) and pretty regularly get busted "borrowing" money from my 10 year old son.  Fuck this; I'm not living like this anymore."

> About 2 years ago, another user wrote: "I saw 'A Leaf of Faith' and got the impression that kratom was a generally friendly substance to use freely, never

knowing how addictive it was, how much it was further numbing me beyond how alcohol already was, how it was slowly wiping out my sex drive, and likely contributing to my perpetual brain fog. … My second attempt [at quitting] was maybe another 7 or 8 months later. Kratom was making me pretty miserable. I was reading posts in this subreddit and I was finally aware of how addicted I was; feeling crappy, sluggish, and sorta spacey pretty much all the time."

About 2 years ago, another user wrote: "What a difficult journey it has been. I was a ~75 GPD [grams per day] user. **Quitting kratom was one of the hardest things I've had to do in my life.** I learned the hard way that kratom causes withdrawals on a work trip 3 years ago. I should have stopped then and there but I gave in because the RLS was so bad. … Kratom withdrawal is seriously no joke so don't think you're the only one struggling so much. I'm only a week free but after this experience I know for sure that I will never go back. Good luck everyone!" (emphasis added).

About 2 years ago, another user wrote a post titled *Kratom Is An Addictive Drug*.  It said, in part: "It's been 23 hours since my last dose. **I just wanted to give my story hoping that it would help others see that they've been lied to, deceived and manipulated into thinking this plant is 'harmless and safe'.** As a matter of fact, reading the horror stories on this subreddit was the first step in my recovery... I started taking it almost 3 years ago after hearing about it on... well, Reddit. They touted it is a miracle plant that had all the benefits of an opioid with none of the side effects." (emphasis added).

About 19 months ago, another user wrote: "I thi**nk the perfect word to describe Kratom addiction is 'insidious'. Here is the definition –** *'proceeding in a gradual, subtle way, but with harmful effects.'* I think this is why it takes so long to realize what is going on. There was never a rock bottom moment for me like there would be for other more conventional abused drugs. No overdose, no bad behavior, no abusiveness to my family, no DWI, etc.. - It was just a lazy, slow descent into nothingness. I was living in a groundhogs day type of existence. Wake up, go to work, leave work, buy an extract shot or 2, have dinner, drink my shot, mindlessly look at my phone and/or watch TV. Wake up and do it all over again." (emphasis in original).

About 12 months ago, another user wrote: "I started using k[ratom] when I had knee surgery Dec 2019 so 3 years. **I didn't want to use pain killers because I got sober from alcohol 3/6/2018 and i felt the pain killers were going to make me relapse.** I didn't know I would end up in a worst place as I am now." (emphasis added).

About 2 years ago, another user wrote: "Was in bed all day yesterday fighting withdrawals. I used to even be an athlete - strong lean and fit, until I got on [kratom] shots and extracts. Didn't even get high any more - just wanted to not feel bad."

About 4 years ago, another user wrote: "I researched kratom before using it and almost every site promoted that its harmless with healthy benefits, and that its withdrawals are like coffee for 3 days max. Information wasn't clear that kratom could become a negative addiction that takes months to recover" … "I took something I thought was helping me for 1.5-2 years, not even knowing the downsides bc that information was so misleading. It fucked up my digestion, energy, mood, brain fog, anxiety, etc. Fuck kratom, and fuck those who peddle it as a harmless cure-all."

About 10 months ago, another user wrote: "For any newcomers: this stuff is absolutely no joke. It's not harmless and the wd [withdrawal] is *definitely* **not** like caffeine. I've cold turkey'd caffeine before and I had a slight headache for a couple

hours. I definitely have never woken up in a pool of my own sweat from not having my caffeine. … **This stuff is a drug. A serious drug. And it's super freakin addictive**. Extracts, powder, or in my case, capsules…it doesn't matter. Yes some forms are more addictive than others but the WD is hellacious no matter how you're taking it." (emphasis original).

About 10 months ago, another user wrote: "This stuff is a drug, and dangerous! **I started taking it because of all the good things I heard and read about it**. I've never been addicted to or dependent on anything before, but this stuff has totally taken control of my life." (emphasis added).

About 9 months ago, another user wrote: "I finally realized a few weeks ago how much of a negative impact kratom was having on my life. I noticed myself planning my whole day around my doses and making sure when I left the house I'd bring an extra dose with me in a shaker bottle. It was heavily affecting my mood overall, but especially in public settings. I did not want to leave my house most days even if I did dose."

About 9 months ago, another user wrote: "**I have been taking OPMS black pills for about a year now. It has ran my bank dry.** When I wake up in the morning I fucking crave this shit. I have never been addicted to opiates or anything like that. I get to the point where I am going to go cold turkey and am so confident but when I wake up my brain makes me think its okay to go get it. I cant talk to anyone about this in my family or friends. I have a very high stress job and am also going through a nasty break up. I feel so alone with trying to stop and when I betray myself and go to get more, i fight back tears in the parking lot (I am a grown ass man). I am not an emotional person and in my environment theres no room for emotions. Should I tapper off? What the fuck do I do?"

About 3 months ago, another user wrote of Defendants' product: "**I was taking one to two opms gold shots a day (sometimes three) for about two years straight**. When the 24hr mark hit the withdrawals kicked in hard. I had become absolutely obsessed with scavenging 20$ togther to make sure I got my shot each day. Constantly driving to the shop, hoping no one would see me pop out. I wanted to quit every night but just couldn't stand the withdrawals. I finally quit (on day 17 ct) with the help of a quit buddy I found in this sub. I'm still not right at all, RLS is there and my sleep is still off. I'm sneezing more than I ever have. But, music is back, I have more money in my pocket and I feel free from the grips. I've still got a long ways to go but am committed to never touching that shit again. It brought out the worst version of me."

54.     This Internet forum is filled with accounts just like these.  The stories are consistent – well-meaning people who were looking to feel better, in mind body and spirit, by taking an "herbal supplement," only to end up with an opioid-like addiction.

55.     What is particularly insidious about kratom is that, at the early stages, many users are unaware of its negative side effects and its addictive potential, so when they begin to experience the malaise of addiction they do not attribute it to the kratom.  Rather, they take more of the substance thinking that it is helping them with their malaise.

56.     As these accounts make clear, the addictive potential of kratom is a material fact to reasonable consumers which would help inform their purchase and consumption decisions.  Indeed, addiction is a disease and as such poses an unreasonable health hazard to consumers.  Accordingly, Defendants have an obligation to disclose on the Products' packaging that their Products pose a risk of addiction.

57.     Defendants' products have no information, whatsoever, that kratom is similar to an opioid, is habit-forming, and that regular use will result in opioid-like dependency, with withdrawal symptoms similar to those of traditional opioids.

58.     Consumers who knew the truth about kratom may not have purchased Defendants' Products or would have paid less than they did for them.

**C.     Peyton Palaio, Mark Reilly, and the Beginning of OPMS**

59.     OPMS kratom was started in or around 2012 by Defendant Peyton Palaio and Mark Reilly at a small office in Marietta Georgia, located at 1880 West Oak Parkway, Suite 214.[18] Palaio and Reilly are long-term associates and friends.  Indeed, Georgia Department of Motor Vehicles records show that a relative of Peyton's, Samuel R. Palaio, gave Reilly a truck in July 2012.[19]  Reilly then transferred ownership of the truck to Defendant Palaio a year later, in June of 2013.[20]

60.     At the time, the two were primarily focused on running a synthetic cannabis operation under the names Omerta Labs, LLC and Lunar Labs, LLC – both located at the same 1880 West Oak Parkway address where the OPMS trademark was registered.[21]  Palaio ran the operation, but Reilly was the registered agent for Lunar Labs at the time.[22]

---

[18] **Exhibit C**, OPMS Trademark Registration

[19] **Exhibit G,** DMV Records

[20] *Id.*

[21] **Exhibit H**, DEA Lawsuit ¶ 21.

[22] https://ecorp.sos.ga.gov/BusinessSearch/BusinessInformation?businessId=1671691&business Type=Domestic%20Limited%20Liability%20Company&fromSearch=True

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

61.      In 2012, the Georgia Bureau of Investigation (GBI) raided the office at 1880 West Oak Parkway to seize the synthetic cannabis that the two were producing.[23]  The agents had caught onto the duo because "they found an invoice, which listed suspected [synthetic cannabis] products recently shipped from the lab, in a nearby dumpster."[24]  During the raid, Palaio was also found producing one of the early runs of OPMS kratom.  As one GBI officer recalled: "[Palaio] had a lot of kratom there … he was making a product, 'Kratom OPM,' he called it … [t]o me, obviously, it was a nod to opium — to get your attention."[25]

62.      The 2012 GBI raid would not be Reilly and Palaio's only run in with law enforcement.  In 2016 US Drug Enforcement Agency (DEA) agents located in Carson, California seized two sophisticated and expensive drug manufacturing machines: a "JTJ-A Semi Automatic Hard Capsule Filling Machine" along with "a SRJ-5 Small Soft Gelatin Capsule Filling Machine."[26]  The machines were bound for "Precision Biologics," located at 1880 West Oak Parkway, Suite 214, Marietta, Georgia.[27]  Research by the agents revealed that Precision Biologics was not a legitimate corporate entity, however.[28]  Further research by the agents showed that Defendant Palaio was associated with the 1880 West Oak Parkway address because he had listed it as the principal place of business for his synthetic cannabis operations: Lunar Labs and Omerta Labs, which he ran with Mark Reilly.[29]  The agents came to suspect that Palaio and Reilly had ordered the machines without prior clearance from the DEA with the intent to manufacture drugs.[30]

63.      The agents' suspicions were confirmed when, in January 2017, Defendant Palaio filed a claim with the DEA "contending that he is the owner of the [] machines" and stating that he

---

[23] **Exhibit H** ¶ 21.

[24] **Exhibit A** at 7.

[25] *Id.*

[26] **Ex. H** ¶ 1.

[27] *Id.* ¶ 12.

[28] *Id.* ¶ 41.

[29] *Id.*

[30] *Id.* ¶ 21.

was only going to use the machines "for research in the area of process scale-up of liquid single dose products."[31]  Palaio's complaint was judged deficient, and he eventually dropped the claim.

64.     In truth, however, the capsule filling machines the DEA had seized from Reilly and Palaio were not intended for use in the production of synthetic cannabis.  Synthetic cannabis, like the kind Palaio and Reilly manufactured at the 1880 West Parkway Address, is not consumed in pill form – rather, it is smoked.  In reality, Palaio and Reilly had purchased the machines for use in the production of OPMS kratom.  The "liquid single dose products" Palaio claimed he was intending to use the machines to produce were not synthetic cannabis – they were OPMS kratom extract shots.

65.     After their two close brushes with the law, and a host of wrongful death lawsuits, Defendant Palaio and Mark Reilly (along with a cadre of other unknown associates) moved on from synthetic cannabis and began the OPMS Kratom Enterprise in earnest.

66.     From the outset, however, the OPMS Kratom Enterprise would be conducted differently.  Palaio and Reilly had previously operated under only a handful of LLC's, all of which they were directly connected to through their secretary of state filings.  This invited the prying eyes of the law and made tracing their operations too easy.  They would not make the same mistake in running the OPMS Kratom Enterprise.

**D.     The Kratom Supply Chain and the OPMS Kratom Enterprise Proper**

67.     If Defendant Palaio and Reilly wanted to avoid attention they would need to abuse the corporate form to its fullest extent.  They would atomize their operations by employing separate corporate entities (i.e., the Defendant entities) for each part of the Enterprise, and they would no longer appear on multiple corporate fillings as officers.  They would incorporate Defendants in multiple states, the majority of which would be in Wyoming where "ownership and operation locations" could be obscured from the public record.[32]  Indeed, Wyoming was chosen because it

---

[31] *Id.* ¶¶ 51-51.

[32] **Ex. A** at 9.

"offers some of the broadest privacy measures for company executives [] who want to remain anonymous."[33]

68.     None of the OPMS Kratom Enterprise's day-to-day operations would be conducted in Wyoming, however.  Instead, the OPMS kratom trail runs primarily through four states: California, Georgia, Colorado, and Texas.

69.     We turn now to the path OPMS kratom takes through these states, along the way detailing how Defendants separately operate at discrete stages of the supply chain to obscure the totality of their efforts in furtherance of the OPMS Kratom Enterprise.  Some of the information pertaining to OPMS was revealed by the Tampa Bay Times in a four-part series attached as **Exhibit A**.  The reporters "analyzed internal company documents, import data, court records, business filings and inspection reports to piece together a first-of-its-kind examination of [the OPMS Kratom Enterprise's] mysterious supply chain."[34]

70.      Kratom is grown by farmers in Southeast Asian countries such as Indonesia and Thailand.  After the kratom plant has matured its leaves are harvested, dried, and pulverized into a fine powder.  The powder is then packaged into boxes and loaded onto cargo ships destined for the United States.

71.     The majority of kratom shipments will enter the country through the Ports of Oakland and Los Angeles, where it is stored in warehouses by domestic kratom suppliers.[35]

72.     Defendants contract with these suppliers to store kratom in such warehouses and provision kratom to the OPMS Kratom Enterprise through large monthly shipments.  To hide the fact that this kratom is intended for the production of the OPMS Products, only a few of the shell companies which comprise the OPMS Kratom Enterprise will take part in this stage of the supply chain.  Oftentimes, however, multiple Defendants – appearing to the kratom supplier as completely independent entities – will tag in and out of business dealing with suppliers to further obscure their

---

[33] *Id.*

[34] *Id.*

[35] *Id.* at 15.

activities (e.g., one entity will place an order for kratom from a supplier and then another will tag in and pay the invoice for that order).

73.     For example, in 2021 a lawsuit was brought by a kratom supplier against Defendant LGI Holdings, LLC for violating the terms of a supply agreement.[36]  The supplier alleged that it had agreed to maintain an inventory of at least 800 metric tons of kratom for LGI Holdings (owned and operated by Peyton Palaio) in a warehouse in Los Angeles.[37]  In exchange LGI/Palaio agreed to purchase 275-300 metric tons of kratom each month.[38]  Peyton represented to the supplier that he needed this much kratom because LGI was part of a larger "network of companies" which comprise "the largest kratom business in the United States" and that he "wanted to expand to integrate the supply, import, and distribution segments into [Defendants'] existing network, and eliminate supply chain disruption."[39]

74.     Over 30 shipments of kratom were made under the deal, destined (on paper) for a company called Alphabet Wholesale, located in an apartment complex in Pasadena, Texas.  Alphabet Wholesale did not exist in any corporate filings, however.  In reality it was a fictious business name Peyton Palaio used for LGI Holdings, LLC, and the kratom was actually destined for Georgia.

75.      The transactions were further complicated by the fact that invoices for these shipments were not paid by LGI Holdings, rather they were paid by Defendant Jopen, LLC.

76.     At first blush, Defendant Jopen does not appear to have any connection to Peyton Palaio or OPMS kratom.  But why then would it pay for these invoices?  The truth is that Defendant Jopen is one of the shell entities Defendants use to hide their dealings and stymie investigations into the OPMS Kratom Enterprise.

77.     Fortunately, a 2021 lawsuit filed by Defendant Jopen itself gives the game away.  The lawsuit, filed in San Diego County, was brought against a San Diego kratom supplier for

---

[36] **Exhibit D,** Cleanview Complaint ¶ 1.

[37] *Id.* ¶ 31.

[38] *Id.* ¶ 32.

[39] *Id.* ¶ 2.

failing to deliver bulk orders of kratom that Jopen had ordered and paid over $600,000 for.[40]  In the complaint, Jopen identifies itself as a Texas corporation "doing business as Innovo Activas and [] American Kratom-D."[41]  As noted above, however, Jopen also does business as A1 Wholesale, Evolutionary Organics, and Party Nuts.  This means that Jopen, LLC operates under at least 5 separate fictious business names for no discernable reason.

78.     Despite this clear attempt to abuse the corporate form and hide its dealings, Jopen's true identity as a shell company of the OPMS Kratom Enterprise's is made clear through invoices it attached to its complaint.  The invoices – one of which is reproduced below – show that Jopen placed orders for kratom but then billed and shipped the orders to its alter-egos, Innovo Activas and American Kratom-D.  The shipping address Innovo Activas and American Kratom-D listed was the very same address that Palaio and Reilly were found packaging OPMS kratom, and where the OPMS kratom trademark was registered: 1880 West Oak Parkway Suite 214, Marietta, Georgia.[42]



---

[40] **Exhibit I,** *Jopen LLC v. Sebastian Guthery, et al.,* No. 37-2021-00013845-CU-BC-CTL, Third Amended Complaint.

[41] *Id.*

[42] **Exhibit J**, *Jopen LLC v. Guthery et al.,* No. 3:21-cv-01233-L-BGS, Kratom Purchase Invoice, Doc. 1-2, at 21-23.

79.     Thus, Jopen, Innovo, and American Kratom-D are nothing more than shell corporations through which act in furtherance of the OPMS Kratom Enterprise to discretely purchase and transport kratom from California to Georgia.

80.     Once in Georgia, other Defendants – acting in furtherance of the OPMS Kratom Enterprise – step in to process, package, and test OPMS kratom before handing the Products off to other Defendants.  Here, Defendant Calibre Manufacturing receives shipments of raw kratom powder at various warehouses scattered around Marietta and Alpharetta, Georgia.[43]  The raw kratom is processed and milled into a fine power.[44]

81.     The processed kratom powder is then split into two groups: one group will be left as raw kratom and sterilized and packaged into OPMS Silver capsules and pouches, while the other will go through the extraction process at a high-tech lab.  Neither of these steps will occur in Georgia, however.  So the raw kratom powder is prepared for shipping to the next entities in the OPMS Kratom Enterprise supply chain.  Defendant Nuza Logistics steps in at this point, handling shipping out of the raw kratom out of Georgia.[45]

82.     Kratom which was to be packaged into the OPMS Silver capsules and pouches is shipped off to Texas where it is sterilized and then returned to Georgia.[46]  The remainder makes its way to Defendant LP Ind. (d/b/a Jordan Process) in Springfield, Colorado.

83.     As the Tampa Bay Times reporting notes:

> Jordan Process is a remote Colorado factory that has processed [OPMS] kratom into extracts.  Property records show a company that listed [Defendant] Palaio as president purchased the land where it is built in 2016.  Ownership is now in the hands of a company managed by his grandfather, who died earlier this year.  Workers say they've seen Palaio at the factory and said the facility was named after his brother Samuel Jordan Palaio.  An internal organization chart from 2021 for Jordan Process lists "PP" as CEO.[47]

---

[43] **Ex. B.**

[44] **Ex. A** at 21.

[45] **Ex. B.**

[46] **Ex. A** at 21.

[47] **Ex. B.**

84.     Jordan Process operates under parent company Olistica Life Sciences Group (although Olistica is itself a fictious business entity under Defendant LP Ind., LLC).  As noted above, Olistica is the company Defendant Palaio described as part of his "operation."  Indeed, until earlier this year a LinkedIn page said Palaio was the former chief executive officer of Olistica.[48]  Olistica and its subsidiaries are Defendants' outward facing attempt to vertically integrate the OPMS Kratom Enterprise supply chain.[49]

85.     As a way to hide the OPMS Kratom enterprise, Olistica advertises itself vaguely as a "fully integrated technology company focused on the research and development, manufacturing, and distribution of natural therapeutics and high-quality plant-based derivatives."[50]

86.     To further hide their operations, Defendants also run a CBD business through the Olistica entities.  Defendants went so far as to hide what workers at Jordan Process were making from them: "[g]reen bricks of kratom powder arrived at [Jordan Process] by the truckload.  Yet no one in management…talked about what the substance was…Supervisors typically referred to it as 'product B' or 'flour.'"[51]

87.     After having been refined into extract powder at Jordan Process in Colorado, the OPMS kratom extract powder is then shuttled back to Georgia where Defendant Calibre Manufacturing packages a portion of it into OPMS Black and Gold Capsules.[52]  The other portion of the extract powder is turned into the liquid OPMS Black and Gold extract shots.  This is also where the raw kratom powder which was sent to Texas for sterilization is packaged into OPMS Silver pouches and capsules.[53]

88.     The OPMS Products are now ready for final packaging and distribution.  This does not occur in Georgia, however.  It occurs in Dallas, Texas.

---

[48] *Id.*

[49] *See* **Ex. E,** Olistica Slide Deck.

[50] https://www.olistica-group.com/#about-olistica

[51] **Exhibit A** at 22**.**

[52] *Id.* at 29.

[53] *Id.*

89.      The entity in charge of placing the OPMS Products in their official packaging is A1 Wholesale (aka Defendant Jopen, LLC/LP Ind., LLC).[54]  A1 Wholesale acts as a wholesaler of various products, including CBD.  However, OPMS kratom is its "bread and butter."[55]  In



interviews, A1 Wholesale employees a describe how "capsules and raw powder were loaded into O.P.M.S. package sleeves inside a vast industrial building" and "liquid extracts were bottled into petite shots."[56]  This fact is independently corroborated by a job review posted by a disgruntled employee on GlassDoor.com.

90.      After packaging, employees at another location in Dallas owned by Defendant Jopen fulfill online orders through Jopen's alter-ego PartyNuts.

91.      PartyNuts acts as the master distributor for the OPMS Kratom Enterprise, through which all other wholesalers and distributors, across the United States including in California, must first order OPMS Kratom Products.

92.      Accordingly, PartyNuts knowingly and intentionally sells and ships OPMS Kratom to buyers across the country, including in California.

93.      As described above, PartyNuts is registered as a fictitious entity under Defendant Jopen, LLC, which also runs A1 Wholesale.

---

[54] *Id.* at 31.

[55] *Id.*

[56] *Id.*

94.    Jopen, LLC is merely a shell corporation acting in concert with the other Defendants at the behest of Defendant Peyton Palaio, Mark Reilly, and other unknown individuals in furtherance of the OPMS Kratom Enterprise.

95.    Thus, Defendants are, together, involved in every step of the OPMS kratom supply chain, from import to distribution.  They act in tandem as conduits through which the OPMS Kratom Enterprise is run.  Martian Sales Inc., by and through Mark Reilly, is part of this web. Together, these entities act as a single enterprise and purposely direct their activities at California and every other State in the nation.  Below is a portion of an infographic (attached hereto as **Exhibit K**) created by the Tampa Bay Times to illustrate OPMS kratom's peregrinations across the country.



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

96.     That said, Defendants have heavy involvement in California in particular because they import raw kratom through California ports and store it in the State.  Defendants have also manufactured OPMS Products for sale in California specifically – OPMS Extract shots are labeled specifically to be sold in California, as they bear a California Proposition 65 warning on them.

97.     Such a label would only be placed on the Product if Defendants intended or anticipated for OPMS kratom to be sold in California.



*A close-up photograph of the Proposition 65 Warning on the back of an OPMS Black bottle.*

98.     By placing the Proposition 65 warning on the OPMS Products, Defendants, including Martian Sales Inc., took affirmative steps to avail themselves of the privilege of conducting business in the State of California.

99.     For years, Defendants have used their shell companies and deliberately convoluted business practices to hide their dealings and elude accountability for their actions.  No longer.

**E.     Defendants Knew or Should Have Known they were Selling a Highly Addictive Drug to Unsuspecting Consumers**

100.    As detailed above, Defendants operate under the brand name O.P.M.S. (short for Optimized Plant Mediated Solutions).  The OPMS Kratom Enterprise is the largest importer, producer, and seller of kratom products in the United States.

101.    Notably, Defendants specialize in kratom extracts.  As Defendants' website used to note: "O.P.M.S. has been an industry-leading supplier of Kratom extract for more than 5 years.  By utilizing O.P.M.S.'s patented extraction process, they have set a new quality, an unrivaled standard in the botanicals market."

102.    Kratom extracts are a concentrated form of kratom, whereby the active kratom alkaloids (MG and 7-MG included) are distilled from the leaf powder and sold in powder or liquid preparations.

103.    The purpose of kratom extracts is to create a vastly more potent product as there is a greater concentration of MG and 7-MG, and all other alkaloids, by weight compared to regular powder kratom.  For example, a single O.P.M.S. Gold Extract capsule, which contains 200mg of kratom extract, has MG and 7-MG in doses equivalent to 4-7 grams of kratom powder.

104.    The liquid extracts are even more potent, with one 8.8ml "shot" of O.P.M.S. Gold Liquid Extract having MG and 7-MG in doses equivalent to 10-15 grams of powder and one "shot" of O.P.M.S. Black Liquid Extract being the equivalent of well over 15 grams of powder.

105.    Defendants' "Black" line of extracts go even further, with 7-MG concentrations 35 times greater than their "Gold" extracts and regular kratom leaf powder.  As discussed above, 7-MG is 17 times more potent on the mu-opioid receptor than morphine.  Thus, the 7mg of 7-MG in a single O.P.M.S. Black Extract capsule is equivalent to roughly 119mg of morphine.

106.    Indeed, Defendants' brand name appears to be a tongue in cheek nod to the power of its extracts: the "OPM" in "O.P.M.S." sounds like "opium" when said aloud.  Indeed Palaio is no stranger to opioids, having been arrested for possession of heroin in 2009.

107.    Consumers who take Defendants' extracts are exposed to significantly elevated levels of MG and 7-MG compared with those who take regular kratom.  This produces greater euphoria and "feel good" effects at first, but only leads to deeper addiction down the road.

108.    No matter what Product consumers take, they are exposed to highly concentrated forms of kratom without knowing just how addictive the extracts, in particular, can be.

109.    As described above, Defendants have accomplished such refinement in their kratom Products because Defendants operate Olistica Life Sciences Group ("Olistica").

110.    Defendant Olistica's stated mission is to "boost" the chemical effects of botanical and organic compounds and legal highs: "Olistica's manufacturing partner [Jordan Process] is a full-service producer and manufacturer of novel materials and botanical APIs specializing in cannabis **as well as both classic and novel plant species** with therapeutic applications. ... Our partner works with global suppliers and agricultural partners to commoditize and **enrich the derivatives of natural products**."[57]

111.    No surprise then, that Defendants hold themselves out as experts in kratom's pharmacology, stating: "O.P.M.S. characterized all apparent alkaloids of the *Mitragyna Speciosa* plant and then determined the most optimal conditions to safely and effectively remove each individual component," and that "during the most common processes used by our competitors, some significant alkaloids are flushed out in the process, leading to inferior products."

112.    Defendants have interacted with growers and distributors in Southeast Asia who have disclosed the addictive nature of kratom to them.  Indeed, Defendants, through Defendant CAG Holdings LLC (d/b/a Companion Ag), may very well own or operate kratom farms in Southeast Asia.

---

[57] https://www.olisticagroup.com/facilities

113.   Even without such interactions, Defendants have received numerous user reports about the addictive potential of kratom in the United States.

114.   If Defendants have been able to characterize each of the kratom plant's alkaloids and understand which of them are "significant" then Defendants are aware of the interaction between MG and 7-MG (the two primary alkaloids in kratom) and the mu-opioid receptor.

115.   Defendants therefore knew or should have known that the Products they were selling were highly addictive.

116.   Despite this knowledge, Defendants have failed to disclose the addictive potential of kratom on its website or on its Products' packaging.

117.   The furthest that Defendants went in "disclosing" the addictive nature of kratom was a single sentence buried in the "DISCLAIMER" page on their website, which stated: "[s]ome publications have suggested kratom may be associated with serious potential side effects, including seizures, liver damage, withdrawal, addiction, abuse, and death."  This is deliberately misleading, and further no such disclaimer is made on the Product packaging in stores, where consumers are most likely to encounter Defendants' statements.  What's more, Defendants' website was taken down sometime in 2024.

118.   The pharmacological effects of MG and 7-MG have been thoroughly studied, and it is well-established that MG and 7-MG act on the same mu-opioid receptors in the brain as traditional opioids.  Further, there are widespread user reports and case studies of addiction and dependency issues.

119.   To reiterate, this is not an instance where the science is still up for debate.  It has been known for decades in the English-speaking world that kratom is highly addictive and has the potential to cause physical and psychological dependence in regular users.  It has been known for over a century in Southeast Asia that kratom is addictive.

120.   Consumers, however, did not have access to this knowledge for years, and to this day misinformation about kratom is rampant.

121.   Defendants, on the other hand, definitively know that kratom users can develop an addiction.  Yet, up until February 2023, Defendant made no efforts to warn consumers about the

1    potential risks of taking its Products.  In November 2023 Defendants' website, opmkratom.com,

2    was plastered with warnings.  This, of course, was too little too late for consumers who visited

3    Defendants' website before this change, and who became addicted to the Products.  Now, in

4    August 2024 the website is gone.

5         122.    Defendants' Products' packaging, in particular, is woefully sparse. A representative

6    image of Defendants' Products is depicted below:

 

123.    On the back of each Product's packaging is a bog-standard disclaimer stating that

users take responsibility for any adverse events or health complications.

124.    Defendant's kratom extract bottle labeling is substantially the same, with minimal disclosures or warnings and barely legible text:



125.    There is no warning to consumers that the Product interacts with opioid receptors, nor is there any warning that the product is highly addictive and that it should not be taken on a daily basis.

126.    Further, the packaging itself is innocuous.  The OPMS logo includes a pleasant-looking green leaf, a filigree is printed on either side of the word "gold" and in each corner of the package is a segment of what looks to be an ornamental frame.  The extract bottle is reminiscent of a "5-Hour Energy" brand bottle.  Nothing about this packaging would lead reasonable consumers to believe they were purchasing compounds similar to opioids, that function on the same mu-opioid receptors in the brain.

127.    Reasonable consumers looking at the Products' packaging would not presume that kratom is highly addictive.

128.    At the time the first complaint was filed, Defendants' website was sparse as well, with most of the text on each page dedicated to extolling its "high pressure/cold water extraction process that preserves the natural integrity of the plant's alkaloids."  The only representations that Defendants made about the properties of its Products is that they are "all-natural" and "the pinnacle of all kratom products."

129.    The only outlier was Defendants' "Black" line of kratom Products, which contains the highest doses of MG and 7-MG.  On each of those product pages Defendants stated that the Product "will quickly become a favorite among our customers."   Perhaps this is because consumers are unwittingly ingesting 7-MG at levels high enough to mimic the effects of a sizable dose of morphine.

130.    Nowhere did Defendants mention that kratom presents the same addiction problems that former opioid users and other consumers would want to avoid.  Those seeking help as they come off opioids may be drawn in by Defendants' statements about kratom without knowing that they risk trading one addiction for another.

131.    The consequences of kratom addiction are not mild: "in humans, opioid-like withdrawal symptoms have been reported following cessation of kratom use," though "the withdrawal syndrome appears to be less severe than withdrawal from morphine."

132.    While kratom withdrawal may be "less severe" than morphine withdrawal, that is hardly a seal of approval – morphine withdrawal is one of the most unpleasant experiences that one can endure in modern life.  And kratom withdrawal, while perhaps "less severe" than morphine withdrawal, is still an "opioid-like withdrawal" (according to the World Health Organization), with the same physical and mental symptoms.  And kratom is unquestionably addictive and habit-forming.

133.    The risk of "opioid-like withdrawal symptoms" is a material fact to reasonable consumers because addiction is a disease and poses an unreasonable health hazard.

134.    What's more, kratom extracts are significantly more potent and addictive than regular raw kratom powder.

135.    As a kratom product manufacturer and distributor, Defendants occupied a position of superior knowledge to the average reasonable consumer, who likely knows next to nothing about kratom.

136.    Defendants, through their misleading advertising and their failure to disclose kratom's addictive properties on its Products' labels, relied upon the average consumer's incomplete knowledge of kratom to sell its Products and get users addicted to kratom.

137.    Defendants fail to disclose kratom's addictive potential because Defendants knows that it is a material fact to reasonable consumers which would influence their purchasing and consumption decisions, likely to Defendants' detriment.

138.    By any metric, Defendants' conduct is immoral, unethical, and contrary to California public policy.

139.    The United States is going through an opiate crisis that is shaking the foundations of our society.  Amid this crisis, Defendants are creating more addicts for no reason other than to line its pockets, without adequate disclosures of its products' risks and through the use of false and misleading packaging.  That cannot – and should not – be allowed, at least when their conduct entails breaches of warranty and violation of state consumer protection statutes (as it does here).

**Plaintiff C.M.'s Experience**

140.    Plaintiff C.M. first heard about kratom through a friend who did not mention the risks of dependency or addiction.  C.M. was suffering from anxiety and was told Defendants' Products were "natural" alternatives to prescription pharmaceuticals.  As such, C.M. did not know that kratom was addictive and had no reason to know.  He began purchasing O.P.M.S. branded kratom capsules and extracts in 2020 from a "smoke shop" in San Mateo, California, and later from www.PureLeafKratom.com, an online kratom retailer.  When C.M. made his first purchase, he reviewed the O.P.M.S. packaging and labels, but there were no disclosures on the package that would have corrected his misunderstanding about the Product's addictive potential.  Because there were no disclosures, C.M. thought that O.P.M.S. kratom could be consumed every day without the risk of physical dependence.  C.M.'s partner at the time was also drawn in by kratom's innocuous image, and began to use daily alongside C.M.

141.    C.M. and his partner later discovered that O.P.M.S. kratom was, in fact, addictive, and found themselves requiring larger and larger doses to stave off withdrawal.  The situation was made even worse because C.M. switched from Defendant's "Gold" extract shots to the "Black" extract shots, which are significantly more potent.  Between May 2022 and May 2023 C.M.'s use was at its worst, and he was consuming one to three bottles of O.P.M.S. black extract each day, costing about $420 a week.  When C.M. attempted to cease using kratom he was wracked by

intense physical and psychological withdrawal symptoms that were substantially similar to traditional opiate withdrawals – with symptoms including panic attacks, flu symptoms, restless legs, sweating, anhedonia, and severe gastrointestinal distress.  C.M. realized he was addicted to kratom in 2021 and felt that he was being held captive by the specter of withdrawal.  Though C.M. wanted to stop, he could not.

142.     C.M. has been unable to kick his addiction to O.P.M.S. kratom, despite taking drastic measures and seeking the help of a doctor who placed him on naltrexone.  Naltrexone blocks the effects of narcotics, but it is typically only given to those attempting to quit heroin or morphine.  The naltrexone was not effective, however, and C.M. returned to kratom.  The situation was even worse for C.M.'s partner.  She had significantly worse withdrawals and was even hospitalized for seizures brought about by her addiction.  Had C.M. known that kratom was so addictive, and that cessation would be so difficult, he would never have purchased the Products.  C.M. made his purchases in and around San Marcos, California.

**Plaintiff M.C.'s Experience**

143.     Plaintiff M.C. suffers from chronic pain among other medical issues, and she had been prescribed opioids to help manage her symptoms.  Though the prescription opioids were effective at relieving her pain at first, M.C. needed greater quantities to achieve adequate pain relief.  Soon, M.C. was experiencing severe withdrawal, and, she recognized that using opioids to manage her pain was unsustainable.  M.C. then made the decision to quit opioids and switch to a safer alternative.  M.C. first learned about kratom from a relative, who suggested it to her as a safer, all-natural alternative to prescription opioids.  Her relative was under the reasonable, but mistaken, impression that kratom was not an opioid and that, as an all-natural supplement, it did not carry any risk of dependency.  Consequently, M.C. believed that kratom was non-habit forming before she made her first purchase, and she had no reason to suspect otherwise.  She began purchasing O.P.M.S. branded "Gold" extracts in October 2018 from a smoke shop in Napa, California.  When M.C. made her first purchase, she reviewed the O.P.M.S. packaging and labels, but there were no disclosures on the package that would have corrected her misunderstanding about the Product's addictive potential.  Moreover, the disclosures on the Product were printed in text so

1    miniscule it was nearly impossible for her to read.  As a result, M.C. thought that O.P.M.S. kratom

2    could be consumed every day without the risk of physical dependence.

3           144.    At first, M.C. found kratom to be an extremely effective substitute for her

4    prescription painkillers.  This is, of course, because kratom is quasi-opioid, but Plaintiff M.C. did

5    not know this at the time.  About six months after she began using Defendants' Products, M.C.

6    discovered that O.P.M.S. kratom was, in fact, addictive, and found herself requiring larger and

7    larger doses to stave off withdrawal.  She started off with two to three bottles of Defendants' Gold

8    extract a day, but over six months her use quickly ramped up.  From April 2019 to October 2021,

9    and she was consuming eight to ten bottles of O.P.M.S. gold extract each day, costing about $945 a

10   week.  When M.C. attempted to cease using kratom she was wracked by intense physical and

11   psychological withdrawal symptoms that were substantially similar to traditional opiates – with

12   symptoms including panic attacks, flu symptoms, restless legs, sweating, anhedonia, and severe

13   gastrointestinal distress.  M.C. realized she was truly addicted to kratom in October 2021 and

14   recognized that she had merely replaced one addiction with another.  Though M.C. wanted to stop,

15   she could not.

16          145.    M.C. recognized she could not beat her addiction on her own, so in October 2021

17   she sought the help of a doctor who placed her on a long term suboxone regimen.  Suboxone is

18   used as a long-term treatment for narcotic addiction.  Suboxone blocks the effects of narcotics, and

19   it is typically only given to the most serious opiate addicts.  M.C. turned to kratom because she

20   wanted to responsibly manage her pain without the risk of addiction.  Had M.C. known that kratom

21   was so addictive, and that cessation would be so difficult, she would never have purchased the

22   Products.

23                                    **CLASS ALLEGATIONS**

24          146.    *Class Definition*.  Plaintiffs bring this action as a class action pursuant to Federal

25   Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of themselves and all other

26   similarly situated consumers, and seek to represent a class (the "**Class**") defined as:

27                  All persons in the United States who, within the applicable statute of
                    limitations period, up to and including the date of final judgment in
28                  this action, purchased O.P.M.S. kratom products.

147.    Plaintiffs also seek to represent a subclass of all Class members who purchased kratom Products in California, within the applicable statutory period (the "**California Subclass**," together with the **Class**, the "**Classes**").

148.    Specifically excluded from the Class are Defendants and any entities in which Defendants have a controlling interest, Defendants' agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

149.    Plaintiffs reserve the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

150.    ***Numerosity.***  Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, the Class comprises at least thousands of consumers throughout California.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

151.    ***Commonality and Predominance***.  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

      a.    whether the labels on Defendants' Products have the capacity to mislead reasonable consumers;

      b.    whether Defendants knew that kratom is a highly addictive substance;

      c.    whether Defendants' conduct alleged herein violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*, California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, and/or California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

      d.    whether Defendants' conduct alleged herein constitutes unjust enrichment;

      e.    whether Defendants' conduct constitutes negligent omission;

      f.    whether Plaintiffs and the Class are entitled to damages and/or restitution; and

      g.    whether Plaintiffs and the Class are entitled to attorneys' fees and costs.

152. **Typicality.** Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs and the Class sustained damages as a result of Defendants' uniform wrongful conduct, based upon Defendants' failure to inform Plaintiffs and all others similarly situated that their Products are highly addictive and akin to opioids.

153. **Adequacy.** Plaintiffs will fairly and adequately protect Class members' interests. Plaintiffs have no interests antagonistic to Class members' interests, and Plaintiffs has retained counsel that have considerable experience and success in prosecuting complex class-actions and consumer-protection cases.

154. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

155. Defendants have acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

156. Without a class action, Defendants will continue a course of action that will result in further damages to Plaintiffs and members of the Class and will likely retain the benefits of its wrongdoing.

157. Based on the foregoing allegations, Plaintiffs' claims for relief include those set forth below.

**FIRST COUNT**
**Violations of California's Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**

158. Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

159. Plaintiffs bring this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

160.    The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act." Cal. Bus. & Prof. Code § 17200.  A practice is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.  Cal. Bus. & Prof. Code § 17204.  Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

161.    As alleged below, Defendants have committed unlawful, fraudulent, and/or unfair business practices under the UCL by: (a) representing that Defendants' Products have certain characteristics that they do not, in violation of Cal. Civil Code § 1770(a)(5); (b) advertising goods and services with the intent not to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9); (c) selling addictive substances to unsuspecting consumers and profiting from their addiction; and (d) failing to disclose that their Products pose a serious risk of addiction;

162.    Defendants' conduct has the capacity to mislead a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances.

163.    Defendants' conduct has injured Plaintiffs and the California Subclass they seek to represent in that they paid money for a product that they would not have purchased or paid more than they would have but for Defendants' failure to disclose the addictive nature of its Products. Such injury is not outweighed by any countervailing benefits to consumers or competition.  Indeed, no benefit to consumers or competition results from Defendants' conduct.  Since consumers reasonably rely on Defendants' labels, and thus also its omissions, consumers could not have reasonably avoided such injury.  *Davis v. Ford Motor Credit Co*., 179 Cal. App. 4th 581, 597-98 (2009); *see also Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010) (outlining the third test based on the definition of "unfair" in Section 5 of the FTC Act).

164.    Pursuant to California Business and Professional Code § 17203, Plaintiffs and the California Subclass members seek an order of this Court that includes, but is not limited to, an order requiring Defendants to (a) provide restitution to Plaintiffs and the other California Subclass

1   members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay

2   Plaintiffs and the California Subclass members' attorneys' fees and costs.

3       165.    Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy

4   at law if, for instance, damages resulting from their purchase of the Product is determined to be an

5   amount less than the premium price of the Product.  Without compensation for the full premium

6   price of the Product, Plaintiffs would be left without the parity in purchasing power to which they

7   are entitled.

## SECOND COUNT
### Violation of California's Consumers Legal Remedies Act,
### Cal. Civ. Code §§ 1750, *et seq.*

10      166.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

11      167.    Plaintiffs bring this claim individually and on behalf of the California Subclass

12  against Defendants.

13      168.    Plaintiffs and California Subclass Members are consumers within the meaning of

14  Cal. Civ. Code § 1761(d).

15      169.    Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have

16  sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not

17  have or that a person has a sponsorship, approval, status, affiliation, or connection which she or she

18  does not have."

19      170.    Cal. Civ. Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a

20  particular standard, quality, or grade, or that goods are of a particular style or model, if they are of

21  another."

22      171.    Cal. Civ. Code § 1770(a)(9) prohibits "advertising goods or services with intent not

23  to sell them as advertised."

24      172.    Defendants violated Cal. Civ. Code §§ 1770(a)(5), (a)(7), and (a)(9) by intentionally

25  and misleadingly representing that their Products are "all natural" and by failing to disclose that

26  their Products are addictive, a fact which is material to reasonable consumers such as Plaintiffs and

27  the California Subclass members.

28

173.    Defendants' misrepresentations and omissions deceive and have a tendency and ability to deceive the general public.

174.    Defendants have exclusive or superior knowledge of kratom's addictive nature, which was not known to Plaintiffs or the California Subclass Members.

175.    Plaintiffs and California Subclass Members have suffered harm as a result of these violations of the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA") because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid had they known that kratom is addictive and causes withdrawals.

176.    Plaintiffs, on behalf of themselves and all other members of the California Subclass, seek an injunction prohibiting Defendant from continuing their unlawful practices in violation of the CLRA.

177.    In compliance with the provisions of California Civil Code § 1782, Plaintiffs sent written notice to Defendants on November 30, 2023, informing Defendants of their intention to seek damages under California Civil Code § 1750.  The letter was sent via certified mail, return receipt requested, advising Defendants that they were in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter expressly stated that it was sent on behalf of Plaintiffs and "all other persons similarly situated."

178.    Because Defendants are a single enterprise, they were all placed on notice of the November 30, 2023 demand letter in compliance with the CLRA.

### THIRD COUNT
**Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***

179.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

180.    Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendants.

181.    Defendants' acts and practices, as described herein, have deceived and/or are likely to continue to deceive Class Members and the public.  As described above, and throughout this

Complaint, Defendants misrepresented that kratom is not addictive.  Such representation is not true.

182.     By its actions, Defendants disseminated uniform advertising regarding their kratom Products to and across California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* (the "FAL").  Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

183.     The above-described false, misleading, and deceptive advertising Defendants disseminated continues to have a likelihood to deceive in that Defendants continue to misrepresent, without qualification, that kratom is not addictive.

184.     In making and disseminating these statements, Defendants knew, or should have known, their advertisements were untrue and misleading in violation of California law.  Defendants know that kratom is addictive yet fails to disclose this fact to consumers.

185.     Plaintiffs and other Subclass Members purchased O.P.M.S. Kratom based on Defendants' representations and omissions that kratom is not addictive.  Once their addictions developed, Plaintiffs felt they could not stop purchasing Defendants' Products despite their efforts to quit.

186.     The misrepresentations and non-disclosures by Defendants of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of the FAL.

187.     As a result of Defendants' wrongful conduct, Plaintiffs and California Subclass Members lost money in an amount to be proven at trial.  Plaintiffs and California Subclass Members are therefore entitled to restitution as appropriate for this cause of action.

188.     Plaintiffs and the California Subclass Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs; and other appropriate equitable relief.

## FOURTH COUNT
### Breach of Implied Warranty

189.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

190.     Plaintiffs bring this claim individually and on behalf of the Classes against Defendants.

191.     This claim is brought pursuant to the laws of the State of California.

192.     Defendants, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, impliedly warranted that that kratom is not addictive and does not cause opioid-like withdrawal symptoms.

193.     Defendants breached this warranty implied in the contract for the sale of its kratom Products because the Products could not pass without objection in the trade under the contract description: the kratom Products were not adequately contained, packaged, and labeled as per Defendants' contract with Plaintiffs and members of the Classes, and the Products do not conform to the implied affirmations of fact made on the marketing and packaging for the Products that the Products are not addictive and do not cause withdrawals.  U.C.C. §§ 2-313(2)(a), (e), (f).  As a result, Plaintiffs and members of the Class did not receive the goods as impliedly warranted by Defendants to be merchantable.

194.     Plaintiffs and members of the Classes purchased the Products in reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose.

195.     The kratom Products were defective when they left the exclusive control of Defendants.

196.     Plaintiffs and members of the Classes did not receive the goods as warranted.

197.     As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiffs and members of the Classes have been injured and harmed because: (a) they would not have purchased O.P.M.S. Kratom on the same terms if they knew that the Products were addictive and could cause opioid-like withdrawal symptoms; and (b) the Products do not have the characteristics, uses, or benefits as promised by Defendants.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

198.     On November 30, 2023, prior to filing this action, Defendants were served with a pre-suit notice letters on behalf of Plaintiffs that complied in all respects with U.C.C. §§ 2-314 and 2-607.  Plaintiffs' counsel sent Defendants a letter advising Defendants that they breached an implied warranty and demanded that Defendants cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  Each of the Defendants are on notice of this letter because they are a singular enterprise.

**FIFTH COUNT**
**Unjust Enrichment**

199.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

200.     Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

201.     Plaintiffs and the members of the Classes conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money they paid to Defendant.

202.     Defendant had an appreciation or knowledge of the benefit conferred on it by Plaintiffs and the members of the Classes.

203.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs and the Class members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because Defendant omitted that the Products were addictive and similar to opioids.  This caused injuries to Plaintiffs and members of the Classes because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

204.     Defendant accepted and retained the benefit in the amount of the gross revenues it derived from sales of the Products to Plaintiffs and the members of the Classes.

205.     Defendant has thereby profited by retaining the benefit under circumstances which would make it unjust for Defendant to retain the benefit.

206.     Plaintiffs and the members of the Classes are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Products.

207.    As a direct and proximate result of Defendant's actions, Plaintiffs and the members of the Classes have suffered in an amount to be proven at trial.

208.    Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Product is determined to be an amount less than the premium price of the Product. Without compensation for the full premium price of the Product, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

209.    Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price will ensure that Plaintiffs is in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their disposal.

## SIXTH COUNT
### Fraud by Omission

210.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

211.    Plaintiffs bring this claim individually and on behalf of the Classes against Defendants.

212.    Defendants distributed their Products throughout the State of California.

213.    Defendants misrepresented that their kratom Products have attributes or qualities that they do not have by failing to disclose that kratom is addictive and can cause opioid-like withdrawal.

214.    Defendants know that kratom is addictive because they interact with kratom vendors, have been made aware of user reports, and have fully characterized kratom's alkaloids and created advanced extraction methods. They further named their kratom "O.P.M.S.," a clear nod to "opium," which is an addictive opiate.

215.    Defendants know that knowledge of kratom's addictive nature is a material fact that would influence the purchasing decision of reasonable consumers because it is an unreasonable health hazard.

216.    The average reasonable consumer in the kratom purchasing context does not know that kratom is addictive and cannot reasonably access that information.

217.    Defendants therefore had a duty to Plaintiffs and the members of the Classes to disclose that kratom is addictive and can cause withdrawals on the Products' packaging.

218.    Consumers reasonably and justifiably relied on Defendants' omission because it is reasonable to assume that a product which is addictive like an opioid would bear some kind of a warning.

219.    As a result of Defendants' omission, Plaintiffs and the members of the Classes paid for kratom Products they may not have purchased, or paid more for those Products than they would have had they known the truth about kratom.

### SEVENTH COUNT
**Negligent Misrepresentation**

220.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

221.    Plaintiffs bring this claim individually and on behalf of the Classes against Defendants.

222.    Defendants distributed their Products throughout the state of California.

223.    Defendants misrepresented that their kratom Products have attributes or qualities that they do not have by failing to disclose that kratom is addictive and can cause opioid-like withdrawal.

224.    Defendants knew or should have known that kratom is addictive because they interact with kratom vendors and has been made aware of user reports and scientific studies. Defendants further characterized each of the alkaloids active in kratom and have in depth knowledge about kratom's addictive potential.

225.    Defendants knew or should have known that knowledge of kratom's addictive nature is a material fact that would influence the purchasing decision of reasonable consumers because addiction is an unreasonable health hazard.

226.    The average reasonable consumer in the kratom purchasing context does not know that kratom is addictive and cannot reasonably access that information.

227.    Defendants therefore had a duty to Plaintiffs and the members of the Classes to disclose that kratom is addictive and can cause withdrawals on the Products' packaging.

228.    Consumers reasonably and justifiably relied on Defendants' omission because it is reasonable to assume that a product which is addictive like an opioid would bear some kind of a warning.

229.    As a result of Defendants' omission, Plaintiffs and the members of the Classes paid for kratom Products they may not have purchased, or paid more for those Products than they would have had they known the truth about kratom.

<b><u>PRAYER FOR RELIEF</u></b>

WHEREFORE, Plaintiffs C.M. and M.C., individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

a.    For an order certifying the Class and naming Plaintiffs as representatives of the Classes and Plaintiffs' attorneys as Class Counsel to represent the Classes;

b.    For an order declaring Defendants' conduct violates the statutes referenced herein;

c.    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

d.    For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.    For prejudgment interest on all amounts awarded;

f.    For an order of restitution and all other forms of equitable monetary relief;

g.    For injunctive relief as pleaded or as the Court may deem proper; and

h.    For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees, expenses, and costs of suit.

<b><u>JURY TRIAL DEMANDED</u></b>

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  August 30, 2024                    Respectfully submitted,

**BURSOR & FISHER, P.A**.

By: *    /s/ Neal J. Deckant        *
        Neal J. Deckant

Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
        lsironski@bursor.com

*Attorneys for Plaintiffs*

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, Neal J. Deckant, declare as follows:

1.      I am counsel for Plaintiffs, and I am a partner at Bursor & Fisher, P.A.  I make this declaration to the best of my knowledge, information, and belief of the facts stated herein.

2.      The complaint filed in this action is filed in the proper place for trial because many of the acts and transactions giving rise to this action occurred in this District, and because Plaintiffs M.C. and C.M. allege they reside in this District.

3.      Plaintiff M.C. alleges they are a resident of Napa, California.

4.      Plaintiff C.M. alleges they are a resident of Burlingame, California.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, executed on August 30, 2024, at Walnut Creek, California.


                                         */s/ Neal J. Deckant*
                                         Neal J. Deckant