**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)
1990 North California Boulevard, 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ndeckant@bursor.com
          lsironski@bursor.com

*Attorneys for Plaintiffs*
*Additional Counsel Listed on Signature Page*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| C.M. and M.C., on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>MARTIAN SALES, INC. (d/b/a CHOICE ORGANICS); PEYTON SHEA PALAIO (a/k/a PAYTON PALAIO or PEYTON PALAIA); JOPEN LLC (d/b/a A1 WHOLESALE, PARTY NUTS, EVOLUTIONARY ORGANICS, INNOVO ACTIVAS, AMERICAN KRATOM-D); LGI HOLDINGS, LLC (d/b/a ALPHABET WHOLESALE); LP IND., LLC (d/b/a OLISTICA LIFE SCIENCES GROUP, CENTRALIZED SERVICES, JORDAN PROCESS, CASCADE NATURALS, DELLA TERRA PHARMACEUTICALS, NATUREA BIOMATERIALS [a/k/a CANNOPY CORPORATION]); CAG HOLDINGS CO, LLC (d/b/a COMPANION AG); CALIBRE MANUFACTURING, LLC (f/k/a ADVANCED NUTRITION, LLC); NUZA, LLC (a/k/a NUZA LOGISTICS, f/k/a ADVANCED NUTRITION, LLC); JOHN DOE CORPORATIONS 1-10; and OTHER JOHN DOE ENTITIES 1-10,<br><br>                              Defendants. | Case No. 3:23-cv-06202-AMO<br><br>**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:        March 6, 2025<br>Time:        2:00 p.m.<br>Courtroom:  10, 19th Floor<br>Judge:  Hon. Araceli Martínez-Olguín |

# TABLE OF CONTENTS

PAGE(S)

INTRODUCTION AND FACTUAL BACKGROUND...................................................1

ARGUMENT ..............................................................................................................4

I.      DEFENDANTS ARE SUBJECT TO THE COURT'S JURISDICTION.............4

        A.      Plaintiffs Allege Personal Jurisdiction Over All Defendants Under an
                Alter Ego Theory......................................................................................4

        B.      Specific Jurisdiction Exists Because Defendants Are The Master
                Distributors Of The OPMS Products In The United States, And
                Defendants Imported Kratom Through California Ports............................9

                1.      Defendants Purposefully Directed Their Activities Toward
                        California...................................................................................10

II.     BECAUSE DEFENDANTS ARE ALTER EGOS OF ONE ANOTHER,
        THE PROSCRIPTIONS ON GROUP PLEADING DOES NOT APPLY ..........13

III.    PLAINTIFFS' CLAIMS SHOULD NOT BE DISMISSED UNDER RULE
        12(B)(6) ..........................................................................................................15

        A.      Plaintiffs Plead Their Consumer Law Claims with the Requisite
                Specificity Under Rule 9(b)......................................................................15

                1.      The FDA, DEA, And Other Agencies Have Been Sounding
                        The Alarm About Kratom's Addictiveness Since At Least
                        2014 ...........................................................................................15

                2.      Defendant Had A Duty To Disclose Material Omissions ............18

                3.      Plaintiffs Have Alleged Reliance With Specificity .....................22

        B.      Plaintiffs State A Viable Claim For Breach Of Implied Warranty .........24

CONCLUSION ........................................................................................................25

1

2

# TABLE OF AUTHORITIES

**PAGE(S)**

3

**CASES**

*Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*,
    480 U.S. 102 (1987) ......................................................................................................... 15, 18, 19

*Ayla, LLC v. Alya Skin Pty. Ltd.*,
    11 F.4th 972 (9th Cir. 2021)............................................................................................... 13, 14

*Boschetto v. Hansing*,
    539 F.3d 1011 (9th Cir. 2008) ................................................................................................ 15

*Chiulli v. Am. Honda Motor Co.*,
    690 F. Supp. 3d 1038 (N.D. Cal. 2023)................................................................................. 29

*City & Cnty. of San Francisco v. Purdue Pharma L.P.*,
    491 F. Supp. 3d 610 (N.D. Cal. 2020)................................................................................ 6, 26

*Conde v. Sensa*,
    259 F. Supp. 3d 1064 (S.D. Cal. 2017) ................................................................................... 5

*ConsumerDirect, Inc. v. Pentius, LLC*,
    2022 WL 1585702 (C.D. Cal. Apr. 4, 2022) .......................................................................... 10

*Continental Appliances, Inc. v. Brand Mktg. Grp., L.L.C.*,
    2012 WL 13020038 (C.D. Cal. June 15, 2012)....................................................................... 16

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Cavanaugh*,
    217 Cal. App. 2d 492 (1963) .................................................................................................. 31

*Drake v. Haier US Appliance Sols. Inc.*,
    2024 WL 590597 (N.D. Cal. Feb. 13, 2024) .......................................................................... 29

*Eisen v. Porsche Cars N. Am., Inc.*,
    2012 WL 841019 (C.D. Cal. Feb. 22, 2012) .......................................................................... 29

*Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*,
    141 S. Ct. 1017 (2021) ............................................................................................... 11, 12, 17

*Fujitsu Ltd. v. Belkin Int'l, Inc.*,
    782 F. Supp. 2d 868 (N.D. Cal. 2011)..................................................................................... 16

*Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*,
    972 F.3d 1101 (9th Cir. 2020) ........................................................................................... 12, 13

*Gonzalez v. Planned Parenthood of Los Angeles*,
    2011 WL 1481398 (C.D. Cal. Apr. 19, 2011)......................................................................... 20

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011) ............................................................................................ 11

*Hammerling v. Google LLC*,
  615 F. Supp. 3d 1069 (N.D. Cal. 2022)........................................................... 25, 26

*Herbal Brands, Inc. v. Photoplaza, Inc.*,
  72 F.4th 1085 (9th Cir. 2023) ......................................................................... 14, 15

*Impossible Foods Inc. v. Impossible X LLC*,
  80 F.4th 1079 (9th Cir. 2023) ............................................................................... 13

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*,
  497 F. Supp. 3d 552 (N.D. Cal. 2020)................................................... 26, 28, 29

*In re MyFord Touch Consumer Litig.*,
  46 F. Supp. 3d 936 (N.D. Cal. 2014) ................................................................... 28

*In re Toyota RAV4 Hybrid Fuel Tank Litig.*,
  534 F. Supp. 3d 1067 (N.D. Cal. 2021) ............................................................... 25

*Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*,
  235 Cal. App. 3d 1220 (1991) ......................................................................... 5, 17

*LeGrand v. Abbott Lab'ys*,
  655 F. Supp. 3d 871 (N.D. Cal. 2023)............................................................. 25, 31

*LiMandri v. Judkins*,
  52 Cal. App. 4th 326 (1997) ................................................................................. 25

*Mesler v. Bragg Management Co.*,
  39 Cal. 3d 290 (1985) ............................................................................................ 5

*Mosher-Clark v. Gravity Defyer Med. Tech. Corp.*,
  691 F. Supp. 3d 1113 (N.D. Cal. 2023)............................................................... 25

*Pebble Beach Co. v. Caddy*,
  453 F.3d 1151 (9th Cir. 2006) .............................................................................. 13

*Ranza v. Nike, Inc.*,
  793 F.3d 1059 (9th Cir. 2015) ................................................................................ 6

*Reynolds v. Binance Holdings Ltd.*,
  481 F. Supp. 3d 997 (N.D. Cal. 2020).................................................................... 6

*Reynolds v. Coca-Cola Co.*,
  2023 WL 7093683 (N.D. Cal. Oct. 25, 2023) ...................................................... 31

*Sandoval v. M1 Auto Collisions Centers*,
  309 F.R.D. 549 (N.D. Cal. 2015) ........................................................................... 8

*SD-3C, LLC v. Biwin Tech. Ltd,*
  2015 WL 1224078 (N.D. Cal. Mar. 17, 2015) ............................................................ 4

*Sonora Diamond Corp. v. Superior Court,*
  99 Cal. Rptr. 2d 824 (2000) .................................................................................... 7

*Stewart v. Electrolux Home Prods., Inc.,*
  304 F. Supp. 3d 894 (E.D. Cal. 2018) ..................................................................... 29

*Swartz v. KPMG LLP,*
  476 F.3d 756 (9th Cir. 2007) .................................................................................. 21

*United States ex rel. Anita Silingo v. WellPoint, Inc.,*
  904 F.3d 667 (9th Cir. 2018) .................................................................................. 21

*United States ex rel. Ginger v. Ensign Grp., Inc.,*
  2022 WL 4110166 (C.D. Cal. Mar. 10, 2022) ......................................................... 20

*United States v. Corinthian Colleges,*
  655 F.3d 984 (9th Cir. 2011) .................................................................................. 20

*United States v. Kindred Healthcare, Inc.,*
  469 F. Supp. 3d 431 (E.D. Pa. 2020) ....................................................................... 21

*United States v. TEVA Pharms. USA, Inc.,*
  2016 WL 750720 (S.D.N.Y. Feb. 22, 2016) ............................................................ 20

*Walden v. Fiore,*
  571 U.S. 277 (2014) .............................................................................................. 11

*Williams v. Yamaha Motor Co.,*
  851 F.3d 1015 (9th Cir. 2017) ........................................................................... 11, 13

*World-Wide Volkswagen Corp. v. Woodson,*
  444 U.S. 286 (1980) .............................................................................................. 16

*Yamashita v. LG Chem, Ltd.,*
  62 F.4th 496 (9th Cir. 2023) .............................................................................. 12, 18

**STATUTES**

Cal. Com. Code § 2314(2)(c) ...................................................................................... 31

Cal. Com. Code § 2314(2)(f) ....................................................................................... 31

**RULES**

Fed. R. Civ. P. 9(b) .................................................................................................... 25

Fd. R. Evid. 201 .......................................................................................................... 2

**INTRODUCTION AND FACTUAL BACKGROUND**

This action arises from Defendants' ("Defendants," or "O.P.M.S.") distribution and sale of kratom, a highly addictive drug that operates on the same opioid receptors as heroin, fentanyl, and morphine.  First Amended Complaint ("FAC"), ECF No. 42 ¶ 1.  Kratom is a plant native to Southeast Asia that is then dried, processed into powder, and then sold as raw powder or as capsules or distilled into a liquid extract.  *Id.*  Defendants operate "the largest kratom business in the United States."  *Id.* ¶ 73.  Indeed, "Defendants are all part of a singular enterprise responsible for various aspects of growing, importing, designing, manufacturing, testing, processing, labeling, packaging, shipping, marketing, and selling their kratom Products under the 'OPMS' brand name across the United States (the "OPMS Kratom Enterprise")."  *Id.* ¶ 2.

Plaintiffs C.M. and M.C. ("Plaintiffs") purchased Defendants' kratom extract products (the "Products") off the shelf from convenience stores.  *Id.* ¶¶ 140, 143.  Nowhere on the Products' packaging or in the store did Defendants disclose the addictive nature of kratom or its propensity to result in physical dependence and withdrawals upon cessation of use. *Id*. ¶¶ 1, 140, 143.  As such, Plaintiffs, like any reasonable consumer, were under the impression that the Products were generally safe to consume and non-addictive.  *Id.* ¶¶ 140, 143.  Never did Plaintiffs think these Products, which were marketed as "botanical supplements" with no label warnings, would operate in substantially the same way as hardcore opiates. *Id.*  Unfortunately, but not surprisingly, Plaintiffs became hopelessly addicted and every attempt to quit resulted in overwhelming opiate-like withdrawal symptoms.  *Id*. ¶¶ 142, 145.  To avoid these withdrawals, Plaintiffs had no choice but to continue purchasing Defendants' Products and, as a result, have spent thousands of dollars on O.P.M.S. kratom Products since their unfortunate foray began.  *Id.* ¶¶ 140, 143.  But this is precisely Defendants' business model: get unsuspecting consumers, like Plaintiffs, addicted and reap enormous profits from them for years.  *Id.* ¶ 3.  It is misery profiteering, plain and simple. Defendants now move to dismiss Plaintiffs' FAC on a host of spurious grounds in an effort to continue their malicious and malignant scheme unimpeded.  *See* Motion to Dismiss ("MTD"), ECF No. 59.

*First*, contrary to what they claim in the MTD, Defendants are *all* alter egos of one another, acting together in furtherance of the OPMS Kratom Enterprise:

1

> The OPMS Kratom Enterprise is spearheaded by Defendant Peyton Palaio and Mark Reilly, President of Martian Sales, Inc., who have employed a web of shell companies, alter egos, business names, assumed names, and trade names to obfuscate the immense scope of their operation and dodge liability for their actions under the OPMS brand. Defendants operate collectively: each of them is within the chain of distribution of OPMS products, operates as OPMS, controls, or owns OPMS, and/or is an affiliate of OPMS. Defendants share principals, membership, agents, and addresses.

FAC ¶ 2.

These allegations are supported by "extensive investigative reporting by the Tampa Bay Times, and upon the research of [Plaintiffs'] counsel." *Id.* Indeed, the evidence overwhelmingly shows that Defendants have deliberately structured their operations in such a way to avoid accountability and minimize the changes of any interested parties "connecting the dots." But the FAC succeeds in connecting those dots and this Court has a vested interest in holding Defendants accountable because, *inter alia*, Plaintiffs' injuries occurred here, ***and the majority of kratom in the United States is imported using ports in this District****. Id.* ¶ 71. Moreover, Defendants act as their own "master distributor for the OPMS Kratom Enterprise, through which all other wholesalers and distributors, across the United States including in California, must first order OPMS Kratom Products." *Id.* ¶ 91. Accordingly, Defendants have purposely directed their activities at California and, specifically, this District. This is not a case of a product being swept into the state by the downstream stream of commerce; rather, Defendants' Products are *deliberately* shipped into and out of this state by Defendants. This Court can and should exercise jurisdiction over Defendants.

*Second*, despite Defendants' assertion to the contrary, Plaintiffs have adequately alleged that Defendants knew that their Products were highly addictive, and intentionally failed to disclose this fact anywhere on their packaging. While this fact appears to be common sense, the FAC is rife with facts and exhibits supporting it. Nevertheless, Defendants argue that the (highly curated) exhibits included in their request for judicial notice somehow proves that they could not have known that kratom was addictive. MTD at 5-6. This preposterous—borderline insulting—argument should be rejected outright. As an initial matter, Defendants' request for judicial notice should be rejected because the information they cite is not "generally known" or capable of being "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FRE 201. But

1   beyond that, the question of what Defendants knew or did not know about kratom's addictiveness
2   (and they did know) is a factual issue that is not appropriate for resolution on the pleadings.
3   Moreover, Defendants' *own exhibits* undermine their feigned ignorance. Most of the documents
4   attached to the MTD explicitly state *that kratom is known to be addictive*. *See* ECF No. 60-1,
5   Defendant's Request for Judicial Notice, Exhibits 1-4.[1] If, after a fuller record has been developed,
6   Defendants want to continue their specious insistence that they did not know kratom was addictive,
7   they are free to bring a motion for summary judgment at the appropriate time.

8       *Third*, Defendant had a duty to warn consumers of their Products' addictiveness because
9   courts in this District have held, in no uncertain terms, that opioid addiction is an "unreasonable
10  health hazard" on its face. Indeed, two courts in this Circuit have already held that kratom addiction
11  specifically is an unreasonable health hazard, which alone obligates and should compel kratom
12  sellers, like Defendants, to disclose the danger *on the product packaging*.[2] On top of this, Defendants
13  are aware, but have never disclosed, that kratom extracts are more potent and addictive than regular
14  kratom. *See* FAC ¶¶ 100-139. Accordingly, Defendants were in exclusive control of knowledge that
15  was material to consumers and had a duty to disclose such knowledge on the Products' packaging.
16  *See also id.* ¶ 111 ("O.P.M.S. has characterized all apparent alkaloids" of the kratom plant).

17      *Finally*, Plaintiffs' claim for breach of implied warranty should be sustained because,
18  contrary to Defendants' argument, by packaging and distributing the Products in capsules and
19  miniature "shots," Defendants impliedly warranted that a single serving of the Products was not
20  habit-forming. However, as the FAC explains, even one capsule of O.P.M.S. "Gold" (the weakest
21  formulation) per day is enough to induce serious addiction in consumers. *Id.* ¶ 103. Defendants'
22  Products thus fail to conform to the implied affirmations of fact they made.

23  ---

[1] Defendants' selection of materials is also incomplete and misleading. For instance, Defendants fail
24  to acknowledge that the FDA banned the import of kratom, nationwide, in 2014 - ***a ban which still***
***stands to this day***. *See* Plaintiff's Request for Judicial Notice, Ex. A. The ban was instituted
25  explicitly because kratom is known to induce "severe withdrawal signs and symptoms." *Id.*
Defendants' whole business is the production, importation, and sale of kratom. FAC ¶¶ 70-72. They
26  cannot seriously claim they were unaware of the FDA's ban or the reasons behind it.

27  [2] *See B.D. and L.M. v. MIT45, Inc.,* Case No. 3:24-cv-00499, Order re Motion to Dismiss ECF No.
10, at 13 (S.D. Cal. July 3, 2024); *J.J. and C.D. v. Ashlynn Marketing Group, Inc.,* No. 3:24-cv-
28  00311, Order re Motion to Dismiss, ECF No. 31, at 19 (S.D. Cal. September 20, 2024).

Defendants' Motion to Dismiss should be denied in its entirety.

## ARGUMENT

## I.    DEFENDANTS ARE SUBJECT TO THE COURT'S JURISDICTION

Despite the thoroughly detailed allegations in Plaintiffs' First Amended Complaint, Defendants once again attempt to evade liability for their actions by contending they are not subject to the Court's jurisdiction.  MTD at 1.  Defendants are wrong.  First, Plaintiffs plausibly allege how Defendants are alter egos of one another, acting in unison in furtherance of a nationwide kratom enterprise under the OPMS brand name (the "OPMS Kratom Enterprise").  Second, Plaintiffs plausibly allege how Defendants control the nationwide distribution of OPMS Products, including in California.  Accepting these allegations as true, as they must be, Defendants cannot escape accountability in this District by depending on "a labyrinth of corporations and limited liability companies to enable [the OPMS Kratom Enterprise] to operate under the radar."  FAC Ex. A at 2.

### A.    Plaintiffs Allege Personal Jurisdiction Over All Defendants Under an Alter Ego Theory

Defendants first argue that Plaintiffs fail to allege facts sufficient to establish personal jurisdiction under an alter ego theory because "Plaintiffs allege no more than that the Defendants are run by the same individuals" and "plead no other actual allegations supporting the alter ego test." MTD at 8.  However, in making this argument, Defendants skip over the 15+ pages of allegations and 100+ pages of exhibits detailing their activities in furtherance of the OPMS Kratom Enterprise. *See, e.g.,* FAC ¶¶ 2, 4, 5, 7-17, 22-23, 59-99; *id.* Ex. A.

"The alter ego doctrine prevents individual or other corporations from misusing the corporate laws by the device of a sham corporate entity formed for the purpose of committing fraud or other misdeeds," and it allows a court to "disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation." *SD-3C, LLC v. Biwin Tech. Ltd*, 2015 WL 1224078, at *5 (N.D. Cal. Mar. 17, 2015).  "The essence of the alter ego doctrine is that justice be done." *Mesler v. Bragg Management Co*., 39 Cal. 3d 290, 30l (1985).  "Generally, alter ego liability is reserved for the parent-subsidiary relationship," however, California courts have

recognized a "single-enterprise rule" where "liability can be found between sister companies." *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.,* 235 Cal. App. 3d 1220, 1249 (1991).

> In effect what happens is that the court, for sufficient reason, has determined that though there are two or more personalities, there is but one enterprise; and that this enterprise has been so handled that it should respond, as a whole, for the debts of certain component elements of it.  The court thus has constructed for purposes of imposing liability an entity unknown to any secretary of state comprising assets and liabilities of two or more legal personalities; endowed that entity with the assets of both, and charged it with the liabilities of one or both.

*Id.* at 1249–50 (quoting 2 MARSH'S CAL. CORP. LAW § 16.23, at 1416 (3d ed. 1990)); *see also Conde v. Sensa,* 259 F. Supp. 3d 1064 (S.D. Cal. 2017) (quoting same and applying single enterprise rule).

Demonstrating that an alter ego relationship exists requires Plaintiffs to demonstrate "(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 635 (N.D. Cal. 2020) (quoting *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015)).  "When considering entities' unity of interest, relevant factors include the commingling of funds and other assets of the entities, the holding out by one entity that it is liable for the debts of the other, identical ownership of the entities, use of the same offices and employees, use of one as a mere shell or conduit for the affairs of the other, inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers." *Id*. (quoting *Reynolds v. Binance Holdings Ltd.*, 481 F. Supp. 3d 997, 1004 (N.D. Cal. 2020)).  "No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied." *Sonora Diamond Corp. v. Superior Court*, 99 Cal. Rptr. 2d 824, 836 (2000).

Here, the FAC contains allegations more than sufficient to justify treating the Defendants as a singular entity, united in the furtherance of the OPMS Kratom Enterprise.  Indeed, nearly every factor in the "unity of interest" analysis is met, and the FAC describes in exhaustive detail how the OPMS Kratom Enterprise operates:   Defendant Palaio and Mark Reilly "have employed a web of shell companies, alter egos, business names, assumed names, and trade names to obfuscate the immense scope of their operation and dodge liability for their actions under the OPMS brand."  FAC

¶ 2.  Specifically, Defendants "operate at discrete stages of the supply chain to obscure the totality of their efforts in furtherance of the OPMS Kratom Enterprise."  *Id.* ¶ 69.

First, nearly all of the Defendants are owned or operated by Defendant Palaio and Mark Reilly.  Palaio started the OPMS brand and is mentioned "by name as the CEO or head of the [OPMS Kratom Enterprise]."  FAC ¶ 8.  Defendant Martian Sales holds the OPMS trademark.  *Id.* ¶ 7.  Palaio has openly held himself out as the CEO of LGI Holdings and LP Ind., LLC.  *Id.* ¶¶ 9 and 10.  Palaio also registered Advanced Nutrition (which later split off into Calibre Manufacturing and Nuza LLC) using a misspelling of his deceased grandfather's name, "Saviero Palaia," as the principal officer.[3]  Furthermore, **all** Defendants share or use the same offices.  Martian Sales, Peyton Palaio, Jopen LLC, Calibre Manufacturing, and Nuza LLC have at various times used 1880 West Oak Parkway, Suite 214, Marietta, GA as a principal office address, a trademark registration address, a shipping address, or a billing address.  *See id.* ¶¶ 7-9, 11, 13, 14.  Martian Sales, LGI, LP Ind., Nuza, and Calibre also use 30 N. Gould Street, Sheridan, WY as their principal office address.  *Id.* ¶¶ 7, 9, 10, 13, 14.  Finally, Martian, LGI, LP Ind., Calibre, and Nuza LLC have, at times, all used 2550 Sandy Plains Road, Suite 225, Box 319 as their principal business address.[4]  *Id.* ¶¶ 7, 9, 10, 13, 14.

Next, there is commingling of funds and assets.  As detailed in the FAC, Palaio used LGI to place orders for enormous shipments of kratom but then used Defendant Jopen, LLC to pay for them.  FAC ¶ 75.  Jopen separately paid for kratom orders but had them shipped to fictitious business entities (*e.g.*, Innovo Activas and American Kratom-D) doing business at the 1880 West Oak Parkway address in Marietta, Georgia.  *Id.* ¶ 78.  Jopen claims to do business as those entities, but it never registered these names with any state authority.  *See* FAC Ex. F.  In truth, Jopen was paying for assets and delivering them to Georgia for use in the production of OPMS kratom by Martian Sales, Calibre Manufacturing, and Nuza LLC.  *Id.* ¶¶ 80, 81.  In so doing, Jopen was also being used as

---

[3] *See* RJN Exhibit B, Advanced Nutrition Georgia Foreign Business Registration

[4] Tellingly, both the Sandy Plains Road address and the 30 N. Gould Street address are just P.O. boxes.  The only physical office location that has been registered with any government authority is the 1880 West Oak Parkway address.

"one of the shell entities Defendants use to hide their dealings and stymie investigations into the OPMS Kratom Enterprise." *Id.* ¶ 76.

Jopen is also the distribution arm of the OPMS Enterprise through a sub-entity called PartyNuts. *Id.* ¶ 90. Indeed, PartyNuts "acts as the master distributor for the OPMS Kratom Enterprise, through which all other wholesalers and distributors, across the United States including in California, must first order OPMS Kratom Products." *Id.* ¶ 91. PartyNuts is not an independent "third party distributor," despite Defendant Martian Sales Inc.'s sworn declaration to the contrary. *See* Dkt. 16-1, Declaration of Mark Reilly. Rather, PartyNuts is a fictitious business entity owned and operated by Jopen, LLC. *See* FAC, Ex. F, Jopen LLC Secretary of State Filing. Consequently, PartyNuts and Jopen are not legally distinct, and PartyNuts' acts and liabilities attach to Jopen. *See Sandoval v. M1 Auto Collisions Centers*, 309 F.R.D. 549 (N.D. Cal. 2015) ("Under California law, [u]se of a fictitious business name does not create a separate legal entity.'") (citation omitted). By acting as the master distributor of OPMS products, Jopen d/b/a PartyNuts acts as a conduit for the affairs of the OPMS Kratom Enterprise as a whole. Indeed, the only plausible reason an obscure entity like PartyNuts (linked to another obscure entity, Jopen) would be used as the *master distributor for the best selling kratom product in the United States* is because Defendants were "atomiz[ing] their operations by employing separate corporate entities" to obscure the scale of the OPMS Kratom Enterprise. FAC ¶ 67.

The FAC contains many additional "shell or conduit" allegations. For instance, Defendant LGI placed orders for kratom which were shipped to "an apartment complex in Pasadena, Texas" and addressed to Alphabet Wholesale, an entity which "did not exist in any corporate filings."[5] FAC ¶ 74. These shipments were "actually destined for Georgia" for use in the production of OPMS kratom. *Id.* Defendant Palaio also claims to run a "network of companies" which comprise the "largest kratom business in the United States, and even shared a pitch deck of the integrated venture's efforts." *Id.* ¶ 10; *see also id.* Exs. E and D. Furthermore, Peyton Palaio and Mark Reilly used

---

[5] Beyond the fact that Alphabet Wholesale is an entirely fabricated business entity, the notion that 240 *metric tons of kratom* could be delivered and stored in the apartment complex where Alphabet claimed to conduct its activities is patently absurd.

1   "Precision Biologics" to order and ship two highly sophisticated drug manufacturing machines to the

2   OPMS Trademark address at 1880 West Oak Parkway, Suite 214, Marietta, GA.  *Id.* ¶ 62; *see also*

3   *id.* Ex. H.  Precision Biologics, however, "was not a legitimate corporate entity."[6]  *Id.*  Further

4   research by Plaintiffs' counsel has revealed that Peyton Palaio used the illegitimate Precision

5   Biologics, Inc. company name to purchase the very land upon which Defendant LP Ind., LLC

6   operates and where OPMS Kratom extract production allegedly occurs.[7]  RJN Ex. C, Precision

7   Biologics Deed and Palaio Statement of Authority; FAC ¶ 10.  Additional shell/conduit activity is

8   evidenced by the fact that Defendant Jopen claims to do business as two entities — Innovo Activas

9   and American Kratom-D — which have never been registered as business names with the Texas

10  Secretary of State and do not appear to exist in any legitimate capacity whatsoever.  *See* FAC ¶ 78;

11  *see also id.* Ex. F (last accessed December 2, 2024).  As Plaintiffs plausibly allege, the purpose in

12  using these fake business entities is to obscure the fact that the kratom shipments are actually

13  intended for use in the production of OPMS Kratom Products.  *Id.* ¶ 72.

14          The totality of these allegations (along with those facts described in the investigative

15  reporting by the Tampa Bay Times, incorporated by reference into the FAC [FAC Ex. A]) is more

16  than enough to support a finding that Defendants have operated jointly at the behest of a few

17  individuals in furtherance of a single enterprise: the production and distribution of OPMS Kratom

18  Products.  *See ConsumerDirect, Inc. v. Pentius, LLC*, 2022 WL 1585702, at *4–*5 (C.D. Cal. Apr.

19  4, 2022) (Plaintiff's allegations that one Defendant had "set up a network of shell companies,

20  including the Alter Ego Defendants … in an attempt to hide its [] involvement, and then attempted

21  to further hide the existence of the shell companies," "for no purpose than as a vehicle for fraud"

22  were sufficiently specific to "state a claim for alter ego liability.").

23

24

25  [6] The DEA agent explains that "based on his research … Precision Biologics at 1880 West Oak

26  Parkway, Suite 214, Marietta, Georgia, as listed on the shipping manifest for the Defendant Machines, is not a legitimate business."  FAC Ex. H ¶ 41.

27  [7] Mark Reilly, president of Martian Sales also makes an appearance at the OPMS Extract facility.

28  Indeed, Reilly claims on tax records to live at the precise address where Plaintiffs allege the facility is located, 23298 US Highway 160, Springfield, CO.  RJN Ex. D, Reilly Highway 160 Address.

1

2

3

4

5

6

7

8

9

10

Finally, Plaintiffs have plausibly alleged that adhering to the fiction of Defendants' separate existence would sanction a fraud or promote injustice. Specifically, Plaintiffs allege that Defendants have "[f]ailed to adequately capitalize themselves such that if only one entity were to be held liable for the actions of the whole it would be unable to compensate Plaintiffs and the putative class for their harms." FAC ¶ 17. It is also abundantly clear, as Plaintiffs allege, that Defendants have deliberately structured themselves and conducted their dealings for the express purpose of "obfuscate[ing] the immense scope of their operation and dodg[ing] liability for their actions under the OPMS brand." *Id.* ¶ 2. The Court should rebuff this blatant attempt to evade justice through abuse of the corporate form and treat Defendants as a single entity. If there ever was such a case, justice and equity demand it here.

11

12

   **B.    Specific Jurisdiction Exists Because Defendants Are The Master Distributors Of The OPMS Products In The United States, And Defendants Imported Kratom Through California Ports**

13

14

15

16

17

18

Defendants contend that Plaintiffs "fail to allege facts sufficient to support specific jurisdiction [because] [t]hey allege only that Defendants knew that their products would wind up in California." MTD at 2. Defendants argue "such knowledge alone is insufficient to establish specific jurisdiction" because "[s]pecific jurisdiction instead requires a defendant to 'purposely avail' itself of the 'privilege of conducting activities in California' " and that "[t]he First Amended Complaint is devoid of any such allegations." *Id.* Defendants misstate the law and the facts.

19

20

21

22

23

24

25

26

The Supreme Court recognizes two types of personal jurisdiction: general and specific jurisdiction. *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). General jurisdiction applies where the corporate defendant is incorporated or has its principal place of business in the forum state. *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1020 (9th Cir. 2017) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 921 (2011)). By contrast, specific jurisdiction arises on a case-by-case basis, with courts analyzing the relationship between the "defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 503 (9th Cir. 2023) (quoting *Ford Motor Co.*, 141 S. Ct. at 1024-25).

27

28

In the Ninth Circuit, specific jurisdiction is analyzed through a three-prong test. *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir.

2020). *First*, the defendant must "purposefully direct his activities" at the forum or "perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum." *Id.* (citation omitted). *Second*, the claim must "arise out of or relate to" those forum-related activities. *Id. Third*, the exercise of jurisdiction must comport with fair play and substantial justice – in other words, it must be reasonable. *Id.*; *see Williams*, 851 F.3d at 1023. Plaintiffs have the burden of satisfying the first two prongs of the "minimum contacts" test. *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154–55 (9th Cir. 2006).

### 1. <u>Defendants Purposefully Directed Their Activities Toward California</u>

Under the first prong of the analysis, "the defendant must purposefully direct its activities toward the forum state, purposefully avail itself of the privileges of conducting activities there, or engage in 'some combination thereof.'" *Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1088 (9th Cir. 2023). Whether the Court analyzes jurisdiction under the "direction" or "purposeful availment" standards "turns on the nature of the underlying claims." *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 979 (9th Cir. 2021). Courts in this Circuit "generally focus [the] inquiry on purposeful availment when the underlying claims sound in contract and on purposeful direction when they arise from alleged tortious conduct committed outside the forum." *Id.* The Ninth Circuit has made clear that "if a defendant, in its regular course of business, sells a physical product via an interactive website and causes that product to be delivered to the forum, the defendant has purposefully directed its conduct at the forum such that the exercise of personal jurisdiction may be appropriate." *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1088 (9th Cir. 2023). In this case, Plaintiffs' claims sound in fraud and involve physical products sold into California; thus, the purposeful direction analysis applies.[8]

Indeed, Defendants are subject to the Court's jurisdiction because they control nationwide distribution of OPMS Products through Defendant Jopen (d/b/a PartyNuts). FAC ¶¶ 90-91. As described in the FAC and Exhibit A, "PartyNuts acts as the master distributor for the OPMS Kratom

---

[8] Defendants plainly misstate the law here, arguing that the purposeful availment test governs jurisdictional analysis. MTD at 2. The 9th Circuit's decision in *Herbal Brands* directly refutes this. *See Herbal Brands*, 72 F. 4th at 1088.

Enterprise, through which all other wholesalers and distributors, across the United States including in California, must first order OPMS Kratom Products." *Id.*; *see also id.* Ex. A at 32 ("[OPMS] employees fulfilled orders through Party Nuts, according to four workers. [It] for years has been a go-to way to buy O.P.M.S. products in bulk."). Indeed, "[s]tores and consumers can't buy O.P.M.S. products directly, according to the brand's website. Instead, they must go through [Party Nuts]." *Id.* Ex. A at 33. "Businesses from all over the country bought in bulk" from PartyNuts. *Id.* Thus, Defendants are not merely placing their Products into the stream-of-commerce and allowing them to be swept into California. Rather, Defendants have deliberately "create[d], control[led], [and] employ[ed] the distribution system" which does so. *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 112 (1987).

There is no middleman here. Defendants, acting as their own master distributor, have routinely sold their Products *directly into California.* That alone is enough to subject Defendants to the Court's jurisdiction. *See Herbal Brands*, 72 F.4th at 1088; *see also Boschetto v. Hansing*, 539 F.3d 1011, 1019 (9th Cir. 2008) ("Where [a third party vendor] is used as a means for establishing regular business with a remote forum…then a defendant's use of [that vendor] may be properly taken into account for purposes of establishing personal jurisdiction."); *Fujitsu Ltd. v. Belkin Int'l, Inc.*, 782 F. Supp. 2d 868, 884 (N.D. Cal. 2011) ("Fujitsu has made a prima facie case of personal jurisdiction. D–Link Corp. purposefully directed its activities at residents of the forum by selling allegedly infringing goods into California, either through [a third party distributor], or directly to California customers."); *California Brewing Co. v. 3 Daughters Brewing LLC*, 2016 WL 1573399, at *5 (E.D. Cal. Apr. 19, 2016) ("Acts by third party retailers are [not] irrelevant to the analysis. [D]efendants [used] national retailers with the intent to develop a national market. … [Therefore,] [i]t would not be reasonable for defendants to disclaim any connection to sales in California. Otherwise, defendants could avoid jurisdiction in a forum simply by acting through a third party and pleading ignorance"); *Continental Appliances, Inc. v. Brand Mktg. Grp., L.L.C.*, 2012 WL 13020038, at *3 (C.D. Cal. June 15, 2012) ("where there is purposeful shipment of a product through an established distribution channel as a result of the defendant's efforts to serve the market for the

product, it is not unreasonable to subject the sale of the product to suit. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980).").

Contrary to Defendants' argument, "[t]he only tie to California" is *not* just that Defendants place "Proposition 65 warnings on O.P.M.S. Extract shots." MTD at 3 (quoting FAC ¶ 96). This, of course, is evidence that Defendants are aware their Products will enter California, but it is far from the only example of such evidence described in the FAC. Defendants place the Proposition 65 warning on the Products and then sell the Products *directly into the State and this District.* FAC ¶ 91. Because Defendants act together in furtherance of the single OPMS Kratom Enterprise, the act of selling the Products into the District by one party (Jopen d/b/a PartyNuts) attaches to all parties, and jurisdiction is proper. *See Las Palmas Associates*, 235 Cal. App. 3d at 1249–1250.

To the extent that further evidence and allegations are needed to support the Court's finding of jurisdiction, Plaintiffs would ask for leave to conduct jurisdictional discovery.

### 2.    Plaintiffs' Harm Arise Out Of And Relate To Defendants' Conduct In The State

Under the second prong, Plaintiffs must show that their claims "arise out of or relate to [D]efendant[s'] contacts" with the forum state. *Ford Motor Co.*, 141 S. Ct. at 1025. To show this, a plaintiff may demonstrate either that there is a "direct nexus … between a defendant's contacts with the forum state and the cause of action," or that their injuries are of a similar type as those that could be foreseeably caused by the defendant's forum contacts. *Yamashita*, 62 F.4th at 504-506.

Here, Plaintiffs' injuries are the direct and foreseeable result of Defendants' selling OPMS Products into and within California. Plaintiffs both encountered Defendants' Products in California and made their purchases here as well. FAC ¶¶ 140-145. Defendants not only imported kratom through *California* ports[9] and stored it in *California* warehouses,[10] they funneled their finished kratom Products *back* into the California market through their distribution arm: Defendant Jopen d/b/a PartyNuts. *Id.* ¶¶ 59-99. In other words, Defendant Jopen d/b/a PartyNuts—again, the distribution arm of the OPMS Kratom Enterprise—is nothing but a conduit for the OPMS Kratom

---

[9] *Id.* ¶ 71; *id.* Ex. A at 15.

[10] *Id.* ¶ 73.

Enterprise to do business in California. *Id.* ¶¶ 91-92. It is inconceivable for Defendants to assert that they could not have foreseen their Products entering and being consumed in California *because they sell the Products through* Jopen (d/b/a PartyNuts)—the "master distributor"—*directly into California. See id.* ¶ 91. Hence, there is a direct line connecting Defendants' sale of OPMS Kratom Products into this forum and Plaintiffs' purchase of those Products.

As explained by Justice O'Connor in *Asahi*, "conduct of the defendant [that] may indicate an intent or purpose to serve the market in the forum State [includes] [1] designing the product for the market in the forum State, [2] advertising in the forum State … or [3] marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi,* 480 U.S. at 112. Here, Defendants have done all three. The Products are designed to include California's Prop 65 warning; advertised in California; and are marketed through a distributor—Jopen d/b/a PartyNuts— "who has agreed to serve as the sales agent in the forum State." *Id.*[11] Indeed, there is zero possibility that the Products could not have entered California's (and this District's) market but for Defendants' actions. Defendants have caused incredible harm to thousands of consumers and allowing them to evade jurisdiction by hiding behind a wholly controlled middleman would result in an egregious miscarriage of justice.

## II.    BECAUSE DEFENDANTS ARE ALTER EGOS OF ONE ANOTHER, THE PROSCRIPTIONS ON GROUP PLEADING DOES NOT APPLY

As an initial matter, Defendants assert that "the Complaint as alleged simply lacks the specificity required by Rules 8(2) and 9(b)" because "Plaintiffs' group pleading … render[s] it impossible to discern which, if any, of the defendants allegedly made misrepresentations or omissions or owed Plaintiffs a duty to disclose, the circumstances giving rise to any such duty and how any of the defendants breached that duty." MTD at 13. Frankly, this argument is unsurprising given that Defendants have, by all appearances, intentionally structured (i.e., internally insulated) their supply chain with this very strategy in mind. *See* FAC Ex. A at 5 ("Workers in Georgia said

---

[11] This case is even more damning than the circumstances in *Asahi* because the distributor here is *not* unrelated to the Defendants, it is an integral part of the OPMS Kratom Enterprise.

they cut off and destroyed shipping labels, buying any trace of stops along the kratom trail.").
Regardless, Defendants are incorrect.

Generally speaking, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant." *United States v. Corinthian Colleges*, 655 F.3d 984, 997–98 (9th Cir. 2011) (internal citation omitted). "But alter ego liability, if alleged, would circumvent this requirement, as it would imply that the two Defendants here are—for all intents and purposes—the same Defendant." *United States ex rel. Ginger v. Ensign Grp., Inc.*, 2022 WL 4110166, at *3 (C.D. Cal. Mar. 10, 2022); *see also Gonzalez v. Planned Parenthood of Los Angeles,* 2011 WL 1481398, at *8 (C.D. Cal. Apr. 19, 2011) ("Therefore, if Ginger successfully alleges that [Defendants] were alter egos of one another, then Rule 9(b)'s proscription on group pleading would not apply."); *United States v. TEVA Pharms. USA, Inc.,* 2016 WL 750720, at *12 (S.D.N.Y. Feb. 22, 2016) (finding that where a complaint alleges a legal relationship between fraud defendants that makes the acts of one attributable to each, Rule 9(b) does not require plaintiffs to allege specific connections between fraudulent representations and particular defendants); *United States v. Kindred Healthcare, Inc.,* 469 F. Supp. 3d 431, 453 (E.D. Pa. 2020) (in cases where the alleged fraud was "perpetrated by sophisticated corporate entities that are related to each other" and plaintiffs allege that defendants were alter egos of each other, courts have held that collective allegations are sufficient to put defendants on notice).

Of course, there is a caveat to this rule: "[i]f a fraudulent scheme resembles a chain conspiracy," wherein "each person is responsible for a distinct act within the overall plan," "then a complaint must separately identify which defendant was responsible for what distinct part of the plan." *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 678 (9th Cir. 2018). However, "there is no absolute requirement that where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify false statements made by each and every defendant." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).

Here, Plaintiffs have properly alleged that Defendants are alter egos acting in concert in furtherance of the OPMS Kratom Enterprise; therefore, "Rule 9(b)'s proscription on group pleading [does] not apply." *See supra* Section I(A). Further, because Defendants most certainly are alleged

to be engaged in a "chain conspiracy" through their participation in the OPMS Kratom Enterprise, the FAC lays out in exhaustive detail the role, responsibilities, and interconnections of each Defendant. *See* FAC ¶¶ 7-14, 59-99. Defendants' handwringing over Plaintiffs' purported group pleading is misplaced and unavailing.

## III.    PLAINTIFFS' CLAIMS SHOULD NOT BE DISMISSED UNDER RULE 12(B)(6)

### A.    Plaintiffs Plead Their Consumer Law Claims with the Requisite Specificity Under Rule 9(b).

Turning to Plaintiffs' claims proper, Defendants argue, broadly, that they must be dismissed because: (1) Defendants could not possibly have known their Products (originally named "Kratom OPM" [FAC ¶ 61]) were addictive; (2) Defendants did not owe Plaintiffs a duty to disclose that kratom is addictive; and (3) Plaintiffs did not rely on "anything any defendant said or did." *See* MTD at 12-19. Defendants are wrong on all accounts, and their arguments will be addressed in turn.

#### 1.    The FDA, DEA, And Other Agencies Have Been Sounding The Alarm About Kratom's Addictiveness Since At Least 2014

As to its knowledge of kratom's addictiveness, Defendants offer up four documents from various government agencies that Defendants assert "demonstrate that it is not plausible that Defendants knew that kratom was [] addictive." MTD at 14. First, even though Defendants only offered excerpted portions of the documents—ostensibly to remove damning information—the documents still undermine Defendants' argument. Second, Defendants completely ignore the decade plus of scientific research and governmental pronouncements about kratom's addictiveness. Third, even if governmental agencies were inconsistent in their approach of kratom's addictiveness, that in no way absolves Defendants from their duty to disclose. At the very least, this is a factual question inappropriate to consider at this juncture.

With respect to the first point, the documents for which Defendants seek judicial notice do them no favors. For instance, Defendants rely heavily on the DEA's decision not to list kratom as a Schedule I controlled substance, apparently conflating this fact to mean that kratom is safe for consumption, which is clearly not the case. Many drugs not listed as Schedule I are still addictive and dangerous. Defendant may be surprised to learn, for instance, that neither **oxycodone** nor **fentanyl** are Schedule I drugs. *See* https://www.dea.gov/drug-information/drug-scheduling.

Defendants have also appeared to have doctored the RJN documents to serve their interests. Tellingly, Defendants' RJN Exhibit 1, the "NIDA Article," is cut short. The omitted section of the article is titled "Is kratom addictive? Do people experience kratom withdrawal?"; it states "[s]tudies suggest people may experience mild to moderate withdrawal symptoms when they stop regular kratom use." The full report is produced in Plaintiffs' concurrently filed Request for Judicial Notice. *See* RJN Ex. E NIDA Report.

As to Defendants' second RJN exhibit, the letter states, in part, that "mitragynine and 7-hydroxymitragynine have many properties of an opioid" and the author suggests studying the "<u>scale and degree of dependence</u> and/or addiction of Americans" using kratom. Defendants' RJN Ex. 3 at 3 (emphasis added). In other words, the author does not ask whether kratom *is* addictive, rather they ask for a study evaluating just how many people *are addicted* to kratom. In that same letter, the author notes that he "also support[s] enhanced public awareness that kratom contains molecules that may potentially be dangerous." *Id.* at 4. Defendant conveniently forgot to highlight this portion of the letter for the Court.

Defendants' RJN Exhibit 3, the WHO report, likewise contains multiple statements pertaining to kratom's potential for addiction, including, (1) "[i]n humans, opioid-like withdrawal symptoms have been reported after cessation of kratom use"; (2) "mitragynine and 7-hydroxymitragynine are partial agonists at the mu-opioid receptor"; and (3) "cessation of regular kratom use may lead to withdrawal symptoms." Finally, Exhibit 4 notes that "[k]ratom alkaloids have demonstrated both affinity and activity at mu opioid receptors, receptor sites known to be associated with abuse."

Defendants' cherry-picked RJN documents are also incomplete and misleading in other ways. For instance, Defendants completely omit any reference to the multiple statements and alerts by federal agencies about kratom—including those about OPMS Kratom, specifically—that have been issued since at least 2014. For example, on November 14, 2017, the then-acting FDA commissioner issued a statement, providing in part: "evidence shows that kratom has similar effects to narcotics like opioids, and carries similar risks of abuse, addiction and in some cases, death." Plaintiffs' RJN Ex. F, November 2017 FDA Statement. A similar statement was issued by the FDA a few months

later.  RJN Ex. G, February 6, 2018 FDA Statement.  Perhaps most damningly, the FDA actually ***banned the import of kratom in February of 2014***, stating that the "[c]onsumption of kratom can lead to a number of health impacts, including respiratory depression, nervousness, agitation, aggression, sleeplessness, hallucinations, delusions, tremors, loss of libido, constipation, skin hyperpigmentation, nausea, vomiting, ***and severe withdrawal signs and symptoms***."   RJN Ex. A, February 28, 2014 FDA Import Alert 54-15 (emphasis added).[12]  It strains logic to believe that Defendants, in their attempts to acquire raw kratom for the production of their OPMS Products, were not aware of any of these statements or alerts.

Next, there is the matter of the Defendants' brand name: OPMS.  Originally, the product was called "Kratom OPM" which one Georgia investigator in 2012 opined was "obviously [] a nod to opium."  FAC ¶ 61.  A fact which Plaintiffs pointed out in their first complaint, before that reporting had been published.  *See* ECF No. 1 ¶ 55.  Defendants would have this Court believe that it was merely a matter of complete and utter coincidence that they happened to name their kratom brand after the exact drug whose effects and addictive characteristics kratom shares.  *See* Defendants' RJN Ex. 3.

Finally, Defendants themselves have made proclamations regarding their kratom expertise.  Indeed, Defendants claim *on their own website* that they have "characterized all apparent alkaloids of the Mitragyna Speciosa plant and then determined the most optimal conditions to safely and effectively remove each individual component."  FAC ¶ 111.  Defendants tout their superiority of their extraction process, stating that "during the most common processes used by our competitors, some significant alkaloids are flushed out in the process, leading to inferior products."  *Id.*  The only logical extension of such statements is that, as Plaintiffs note, "if Defendants have been able to characterize each of the kratom plant's alkaloids and understand which of them are 'significant' then Defendants are aware of the interaction between [mitragynine] and 7-[hydroxymitragynine] (the two primary alkaloids in kratom) and the mu-opioid receptor."  *Id.* 114.

---

[12] Somehow, despite the ban, Defendants have managed to keep a steady supply of raw kratom shipments flowing through ports in this District.  The Tampa Bay Times reporting referenced in the FAC discusses how Defendants have allegedly managed this feat of circumvention.  *See* FAC Ex. A at 5.

Taken together, Plaintiffs' allegations, the FDA and DEA statements, and those contained in Defendants' own RJN documents, can only lead to the conclusion that Defendants are now, and have been all along, distinctly aware of kratom's addictive properties.[13] This is more than enough at this stage. *See also Mosher-Clark v. Gravity Defyer Med. Tech. Corp.*, 691 F. Supp. 3d 1113, 1118 (N.D. Cal. 2023) ("intent, knowledge, and other conditions of a person's mind may be alleged generally.") (quoting Fed. R. Civ. P. 9(b)); *LeGrand v. Abbott Lab'ys*, 655 F. Supp. 3d 871, 896 (N.D. Cal. 2023).

## 2.    Defendant Had A Duty To Disclose Material Omissions

Defendants next argue that Plaintiffs' fraud-based claims fail because "Plaintiffs have failed to allege that any of the eight defendants had a duty to disclose" that kratom is addictive.  MTD at 19.  However, as multiple California courts have already found, kratom poses an unreasonable health hazard and manufacturers like Defendants owe consumers, like Plaintiffs, a duty to disclose the risks of kratom consumption **on the packaging**.  *See B.D. and L.M. v. MIT45, Inc.,* Case No. 3:24-cv-00499, Order re Motion to Dismiss ECF No. 10, at 13 (S.D. Cal. July 3, 2024); *J.J. and C.D. v. Ashlynn Marketing Group, Inc.,* No. 3:24-cv-00311, Order re Motion to Dismiss, ECF No. 31, at 19 (S.D. Cal. September 20, 2024).

A defendant "has a duty to disclose when either (1) the defect at issue relates to an unreasonable safety hazard or (2) the defect is material, 'central to the product's function,' and the plaintiff alleges one of the four *LiMandri* factors." *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1085 (N.D. Cal. 2022) (quoting *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1101–02 (N.D. Cal. 2021)).  "The *LiMandri* factors are (1) the defendant is in a fiduciary relationship with the plaintiff; (2) the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) the defendant actively conceals a material fact from the plaintiff; or (4) the defendant makes partial representations but also suppresses some material facts." *Id.* at 1085 (citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997)).

The risk of addiction and its concomitant health consequences, particularly with opioids, is (1) material on its face, (2) an unreasonable safety hazard, *and* (3) goes to the Product's central

---

[13] In all likelihood, Defendants have been keenly aware of this since the moment Peyton Palaio was caught packaging "Kratom OPM" Products in 2012.  FAC ¶ 61.

1    function.  *See Hammerling*, 615 F. Supp. 3d at 1085 n.8 (Breyer, J.) (discussing *Purdue Pharma*

2    *L.P.,* 491 F. Supp. 3d at 610) ("Moreover, a duty to disclose existed under any [omissions] theory.

3    The omitted facts related to an unreasonable safety hazard <u>and</u> were material and went to opioids'

4    central function.") (emphasis original); *see also In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod.*

5    *Liab. Litig.*, 497 F. Supp. 3d 552, 628 (N.D. Cal. 2020) (plaintiffs adequately alleged omissions-

6    based claims because addictiveness of JUUL electronic cigarettes "create[d] an unreasonable risk to

7    their personal safety," and JUUL was under a duty to disclose this fact.). Thus, the FAC's allegation

8    satisfy *both* of the initial prongs of *Hammerling*.

9        The FAC is also *replete* with allegations satisfying the *LiMandri* factors, including that (1)

10   the Products bore an unreasonable safety risk, (2) that Defendants had exclusive knowledge of the

11   risk, and (3) that Defendants made partial representations while suppressing material facts.

12       *First*, with respect to the unreasonable safety risk factor, the FAC alleges in no uncertain

13   terms that "[k]ratom is perniciously addictive" because it "works on the exact same [mu-opioid]

14   receptors in the human brain as morphine and its analogs, has similar effects as such, and critically,

15   has the same risk of physical addiction and dependency, with similar withdrawal symptoms."  FAC

16   ¶ 1.  These are not conclusory allegations but are backed up by scientific research: "The mu-opioid

17   receptor is known as 'the gateway to addiction' because it is the receptor which all opiates/opioids

18   interact with to produce the classic opiate high."  *Id.* ¶ 35.  Somewhat shockingly, Kratom's active

19   alkaloids "[m]itragynine and 7-hydroxymitragynine were found to be more potent to the mu-opioid

20   receptor than morphine via oral administration, 7-MG in particular is 17 times more potent than

21   morphine."  *Id.* ¶ 37.  Thus, "repeated use of kratom [] results in opioid withdrawal symptoms."  *Id.*

22   ¶ 39.  "The symptoms of kratom withdrawal … include: irritability, anxiety, difficulty concentrating,

23   depression, sleep disturbance including restless legs, tearing up, runny nose, muscle and bone pain,

24   muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, and extreme

25   dysphoria and malaise."  *Id.* ¶ 32.  Indeed, kratom is *so* addictive that both Plaintiffs <u>sought out</u>

26   <u>medical assistance</u> and were prescribed either naltrexone or suboxone to help them quit.  *Id.* ¶¶ 142,

27   145.  These drugs are "typically only given to the most serious opiate addicts."  *Id.* ¶ 145.

28

The two California courts to address the question of whether kratom poses an unreasonable health risk have both concluded, resoundingly and unequivocally, that it does. The plaintiffs in *Mit45* and *Ashlynn* alleged similar facts as those here—namely, that they experienced opioid-like withdrawal symptoms after attempting to stop using kratom products.  *See B.D. and L.M. v. MIT45, Inc.,* Case No. 3:24-cv-00499, Order re Motion to Dismiss ECF No. 10, at 12 (describing the withdrawal symptoms alleged in the operative complaint); *J.J. and C.D. v. Ashlynn Marketing Group, Inc.,* No. 3:24-cv-00311, Order re Motion to Dismiss, ECF No. 31, at 16 (same).  The courts in both cases found that the ***risk of addiction and withdrawal symptoms was an unreasonable health hazard*** sufficient to confer a duty to disclose, and that the defendants had failed to carry out that duty.  *MIT45, Inc.,* Case No. 3:24-cv-00499, MTD Order at 12 ("Plaintiffs' omission claim is that the Products are dangerously addictive. Nothing in [d]efendant's disclaimers and warnings address this fact."); *Ashlynn Marketing Group, Inc.,* No. 3:24-cv-00311, MTD Order at 16 ("The Court finds these allegations sufficient to show that Defendant's kratom products pose an unreasonable safety risk.").  Plaintiffs here allege substantially the same relevant facts as those in *Mit45* and *Ashlynn*. *Compare* FAC ¶¶ 24-59, 100-145 *with Ashlynn*, ECF No. 7 ¶¶ 1-70 *and Mit45*, ECF No. 1 ¶¶ 1-86. Accordingly, there is no reason for this Court to depart from the well-trodden conclusion that the risk of kratom addiction is an unreasonable health hazard Defendants were obliged to disclose.

*Second*, Defendant had exclusive knowledge about kratom's addictiveness and particularly about the significant risks associated with its extract shots.  As the Complaint makes clear, "kratom is relatively unknown to the average consumer."  *Id.* ¶ 49;  *see also id.* ¶ 3 (the public has "limited knowledge about kratom and its pharmacology.").  Indeed, "[w]hen reasonable consumers think of opiates and opioids … they do not expect that the 'all natural' product bought at their local corner store operates like an opioid, with similar addiction and dependency risks." *Id.* ¶ 1.  Depictions of kratom in the public until recently have painted the plant as harmless, as recollected by kratom users discussing their addictions.  *See id.* ¶ 53 ("I saw 'A Leaf of Faith' and got the impression that kratom was a generally friendly substance to use freely, never knowing how addictive it was."); *see also id.* ("I researched kratom before using it and almost every site promoted that its harmless with healthy benefits … Information wasn't clear that kratom could become a negative addiction that takes months

1    to recover.").  While consumers were kept in the dark, Defendants were busy "characterize[ing] all

2    apparent alkaloids of the *Mitragyna Speciosa* plant." *Id.* ¶ 111.  "Defendant therefore knew or should

3    have known that the Products it was selling were highly addictive." *Id.* ¶ 115.

4        This is not even to mention Defendants' premium line of extract shots, which "are even more

5    potent, with one 8.8ml 'shot' of O.P.M.S. Gold Liquid Extract having alkaloid contents equivalent

6    to 10-15 grams of powder and one 'shot' of O.P.M.S. Black Liquid Extract being the equivalent of

7    well over 15 grams of powder." *Id.* ¶¶ 103-104.  Indeed, Defendants' brand name appears to be a

8    tongue in cheek nod to the power of its extracts: the "OPM" in "O.P.M.S." sounds like "opium"

9    when said aloud." *Id.* ¶ 106.  "Yet, up until February 2023, Defendant made no efforts to warn

10   consumers about the potential risks of taking its Products." *Id.* ¶ 121.  What's more, there may have

11   been some knowledge about kratom's addictive potential floating in the scientific world, this

12   information was not disseminated to the public. *Id.* ¶ 120.  Further, this information did not cover

13   the substantially more addictive potential of Defendants' extract products.  This is significant as

14   Defendant held onto a key piece of information, that its Products were more potent and addictive

15   than regular kratom, and *still* has not disclosed this fact to consumers, even to this day.  *See Mit45,*

16   ECF No. 10 at 11-12 ("While knowledge of the addictiveness of the raw form of kratom may be

17   readily available, MIT45 sells much more concentrated Products that Plaintiffs allege are highly

18   addictive.  As such, Plaintiffs adequately alleged that users reasonably believe that the Products are

19   not addictive, and that MIT45 is in exclusive control of information stating otherwise."); *In Re JUUL*,

20   497 F. Supp. 3d at 629 (Donato, J.) ("Because the disclosures identified by [plaintiff] did not disclose

21   the specific heightened nicotine delivery and potential for heightened addictiveness of JUUL, the

22   'exclusive knowledge' prong has been adequately alleged.); *see also In re MyFord Touch Consumer*

23   *Litig.*, 46 F. Supp. 3d 936, 960 (N.D. Cal. 2014) ("Even if the public—and therefore Plaintiffs—

24   were aware of some problems with MFT, that does not establish that either the public or Plaintiffs

25   knew or should have known of the severity of the problems, including the fact that the problems

26   could not be fixed (as alleged by Plaintiffs).").

27       Defendants' reliance on *Drake v. Haier* is unavailing.  *Drake* is fundamentally

28   distinguishable from this case because the plaintiff there "fail[ed] to plead the second and fourth

elements of fraud by omission: that Haier held a duty to disclose the fact of the emissions to him, or that Drake justifiably relied on Haier's concealment of the dangerous emissions from his gas stove." *Drake v. Haier US Appliance Sols. Inc.*, 2024 WL 590597, at *6 (N.D. Cal. Feb. 13, 2024).  Here, on the other hand, Plaintiffs *have* alleged how and why Defendants owed a duty to disclose and that they detrimentally relied on the omission.  *See* FAC ¶¶ 140-145, 217, 218. Defendants utterly failed in carrying out this duty and, especially following the holdings in *Ashlynn, Mit45, In Re JUUL* and *Purdue Pharma*, Plaintiffs' omissions-based claims should be sustained.

### 3.    Plaintiffs Have Alleged Reliance With Specificity

Next, Defendants argue that Plaintiffs fail to allege reliance because they "allege expressly that their purchasing decisions were based on representations made not by any defendant, but by *third party* friends and family."  MTD at 17.  This argument is nothing more than a red herring and Plaintiffs have properly plead reliance on Defendants' omissions under Rule 9(b).

"At the pleading stage … 'a plaintiff can establish reliance by plausibly alleging [he/she] would have behaved differently had the disclosure been made.'" *Chiulli v. Am. Honda Motor Co.*, 690 F. Supp. 3d 1038, 1061 (N.D. Cal. 2023).  "[T]o plead the circumstances of omission with specificity, [a] plaintiff must describe the content of the omission and where the omitted information should or could have been revealed as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and failed to include the allegedly omitted information.'" *Stewart v. Electrolux Home Prods., Inc.,* 304 F. Supp. 3d 894, 907 (E.D. Cal. 2018) (quoting *Eisen v. Porsche Cars N. Am., Inc.*, 2012 WL 841019, at *3 (C.D. Cal. Feb. 22, 2012).

Here, Plaintiffs have met their burden for pleading omissions.  First, Plaintiffs plead the content of the omission: "[t]here is no warning [on the Product labels] that [kratom] interacts with opioid receptors, nor is there any warning that [kratom] is highly addictive and that it should not be taken on a daily basis." FAC ¶ 125.  In fact, "[t]he only [label] representation that Defendant makes about the properties of its Products is that they are 'all-natural' and 'the pinnacle of all kratom products." *Id.* ¶ 128.  "The furthest that Defendant went in 'disclosing' the addictive nature of kratom was a single sentence buried in the 'DISCLAIMER' page on its website, which stated: '[s]ome

1    publications have suggested kratom may be associated with serious potential side effects, including

2    seizures, liver damage, withdrawal, addiction, abuse, and death.'" *Id.* ¶ 117.

3        But the simple fact is that the vast majority of Defendants' Products are purchased over-the-

4    counter, so any purported website disclaimers on Defendants' (now non-existent) website, whether

5    buried in browsewrap or not, are futile and legally insufficient. *See id.* ¶¶ 121, 140-145.  Indeed, in

6    Plaintiffs' case, they only saw the physical packaging on store shelves, where no such disclaimer is

7    made. *Id.*; see also *id.* ¶¶ 122, 124 (reproduction of representative images of Defendants' packaging).

8        As to the factual question of where the omitted warning could or should have been disclosed,

9    Plaintiffs each "reviewed the O.P.M.S. packaging and labels, but there were no disclosures on the

10   package that would have corrected [their] misunderstanding about [kratom]'s addictive potential."

11   *Id.* ¶¶ 140, 143.  Plaintiffs also relied on other express or implied affirmative representations by

12   Defendants, including that "[t]he [O.P.M.S.] logo includes a pleasant-looking great leaf, a filigree is

13   printed on either side of the word 'gold' and in each corner of the package is a segment of what looks

14   to be an ornamental frame. The extract bottle is reminiscent of a '5-Hour Energy' brand bottle." *Id.*

15   ¶ 126.   Taken together with the failure to warn, these elements convey the impression that

16   Defendants' Products are innocuous, harmless botanical supplements, not opioids.  *Id.; see also id.*

17   ("Nothing about [the O.P.M.S.] packaging would lead reasonable consumers to believe they were

18   purchasing compounds similar to opioids, that function on the same mu-opioid receptors in the

19   brain."). This "misunderstanding" could have been easily corrected by a warning on the label.  *See

20   id.* ¶¶ 140-145.

21       Finally, Plaintiffs allege reliance because they would not have purchased Defendants' OPMS

22   Products had they included any warning on the packaging about addictiveness.  *Id.* ¶¶ 142, 145.

23   Together, these allegations should be sufficient here, as they were in *Mit45* and *Ashlynn Marketing.*

24   *See Mit45*, Order re MTD at 13 (finding Mit45's generic FDA warnings "insufficient to comply with

25   a duty to disclose the alleged risk of addictiveness of the Products."); *Ashlynn*, Order re MTD at 15

26   ("Specifically, [p]laintiffs sufficiently allege that they would have behaved differently if Defendant

27   had disclosed kratom's addictiveness.").

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.      Plaintiffs State A Viable Claim For Breach Of Implied Warranty**

Defendants next contend that Plaintiffs' claim for breach of implied warranty "fails because they do not allege that the kratom products are unfit for their ordinary and intended purpose." MTD at 21. Defendants mischaracterize Plaintiffs' theory of liability.

To state a claim for breach of implied warranty, a plaintiff must allege that a Product failed to "conform to the promises of fact made on the container or label if any." *Reynolds v. Coca-Cola Co.*, 2023 WL 7093683, at *3 (N.D. Cal. Oct. 25, 2023) (quoting *LeGrand*, 655 F. Supp. 3d 871). "No particular words are necessary to create a warranty. Any affirmation of fact or any promise relating to the goods is a[] [] warranty if the natural tendency of such affirmation or promise is to induce the person to whom it is addressed to act in reliance thereon and that person does so act." *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Cavanaugh*, 217 Cal. App. 2d 492, 512 (1963).

Defendants attempt to constrain Plaintiffs' implied warranty claim to part 2(c) of the statute, which states that a good violates the statute if it is "unfit for the ordinary purposes for which such goods are used." Cal. Com. Code § 2314(2)(c). However, Plaintiffs bring their claim for breach of implied warranty under, parts 2(a), (e), and (f), not (c). FAC ¶ 193. Primarily, Plaintiffs base their claim on violation of section 2(f), which mandates that goods "conform to the promises or affirmation of fact made on the container or label." Cal. Com. Code § 2314(2)(f).

Here, Plaintiffs allege that Defendants impliedly warranted that their Products could be consumed without the risk of addiction. *Id.* ¶¶ 140, 143. Though not explicitly stated in words, Defendants made these affirmations through the O.P.M.S. shot and capsule packaging itself. As depicted in the FAC, Defendants' Products come in small packages, just two capsules or a small "5-Hour Energy" sized shot cannister. *Id.* ¶¶ 122, 124. It stands to reason that a consumer looking at these packages, especially the capsule package, would assume that the serving size is one whole capsule. However, as alleged in the FAC, even "a single O.P.M.S. Gold Extract capsule, which contains 200mg of kratom extract, has mitragynine and 7-hydroxymitragynine in doses equivalent to 4-7 grams of kratom powder." *Id.* ¶ 103. "The liquid extracts are even more potent, with one 8.8ml "shot" of O.P.M.S. Gold Liquid Extract having mitragynine and 7-hydroxymitragynine in

doses equivalent to 10-15 grams of powder and one "shot" of O.P.M.S. Black Liquid Extract being the equivalent of well over 15 grams of powder." *Id.* ¶ 104. And "Defendants' 'Black' line of extracts go even further, with 7-hydroxymitragynine concentrations 35 times greater than their 'Gold' extracts and regular kratom leaf powder." *Id.* ¶ 105. Taking even just one of these "highly concentrated" extract capsules or shot cannisters daily is sufficient to induce addiction. *Id.* ¶ 108. Accordingly, Defendants' implied affirmation of fact as to how much product "should" be taken at once constitutes a simultaneous affirmation that the manufacturers recommended serving size is safe to consume without risk of addiction. These affirmations were false, and Defendants have violated the statute.

**C.    Plaintiff M.C.'s Claims Are Timely**

Finally, Defendants argue that Plaintiff M.C.'s claims are time barred because she "filed her complaint more than four years after she knew she was addicted to kratom." MTD at 23. Defendants are wrong.

Defendant is correct to the extent that Plaintiff M.C. makes apparently contradictory allegations in that she states she realized she was addicted to kratom in April 2019 and in October of 2021. *See* FAC ¶ 144. However, as Plaintiffs' counsel noted in their prior opposition to Defendant Martian Sales Inc.'s motion to dismiss: "[t]he contradictory allegation that M.C. 'discovered' her addiction six months after beginning to use was written in error. ... The proper allegation can be found further down the same paragraph where M.C. states that she 'realized she was truly addicted to kratom in October 2021.' " ECF No. 27 at 10 fn. 5. Unfortunately, this correction was missed by Plaintiffs' counsel in the operative complaint. Plaintiffs' counsel expended considerable time and effort researching and uncovering the contours of Defendants' OPMS Kratom Enterprise and spent equal amounts of time drafting the amended complaint and incorporating the evidence discovered. As a result, this correction slipped by Plaintiffs' counsel, but if given leave to amend it will be fixed.

**CONCLUSION**

For the foregoing reasons Plaintiffs respectfully request the court to deny Defendants' Motion to Dismiss in its entirety.

1   Dated: December 6, 2024              **BURSOR & FISHER, P.A**.

2                                        By:   /s/*Luke W. Sironski-White*

3                                        Neal J. Deckant (State Bar No. 322946)

4                                        Luke Sironski-White (State Bar No. 348441)
                                         1990 North California Boulevard, 9th Floor
5                                        Walnut Creek, CA 94596
                                         Telephone: (925) 300-4455
6                                        Facsimile: (925) 407-2700
                                         Email: ndeckant@bursor.com
7                                                 lsironski@bursor.com

8                                        **LYNCH CARPENTER, LLP**

9                                        Todd D. Carpenter (State Bar No. 234464)
                                         todd@lcllp.com
10                                       Scott G. Braden (State Bar No. 305051)
                                         scott@lcllp.com
11                                       1234 Camino del Mar
                                         Del Mar, CA 92014
12                                       Telephone: (619) 762-1910
                                         Facsimile:  (858) 313-1850
13

14                                       *Attorneys for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28